MONTY M. STANLEY, Plaintiff-Appellee, *v.* MARJORIE TAYLOR, Defendant-Appellant.

(No. 11436;

Fourth District—February 7, 1972.

*Rehearing denied March 7, 1972.*

C. G. Colburn, of Virginia and Brunsman, Crain & Kenney, of Springfield, (C. G. Colburn and Robert H. Brunsman, of counsel,) for appellant.

Thomas F. Londrigan, of Springfield, (Boyle & Winn, of counsel,) for appellee.

Drach, Terrell & Deffenbaugh, of Springfield, *amicus curiae.*

Mr. JUSTICE ALLOY delivered the opinion of the court:

Defendant Marjorie Taylor appeals from a verdict and judgment rendered against her for the sum of $75,775 in the slander action instituted by plaintiff Monty M. Stanley in the Circuit Court of Cass County.

When the incident occurred which gave rise to the present action, plaintiff was principal of Virginia High School, Virginia, Illinois, and defendant was a teacher in the same school. Plaintiff, who had no previous experience as a principal, had been employed by the school in August, 1963, while defendant had been a teacher there since September, 1954. On the evening of December 2, 1963, the mother of defendant suffered a stroke and defendant sat up in a hospital for almost all of the night. She was called away from the school to the hospital the following morning, but returned and held her afternoon history class after which she again left the school and went to the hospital. Her movements in and out of the school, it appears, were not coordinated with plaintiff and there was uncertainty among the students as to whether her afternoon class would be held.

The day following, December 4, 1963, at the opening of her history class at 1:05 P.M., defendant sent a girl student to plaintiff's office, adjacent to the classroom, to obtain an "admittance slip," inasmuch as the student had been absent from the prior day's class. She was absent, it appears, because she had spent the time in the school gymnasium assisting a coach in the painting of a decoration. When the student came back to the classroom without the slip, defendant accompanied her back to plaintiff's office. Several persons were present in the office at the time,

and it was further testified that loud voices in the office could be heard in nearby classrooms.

While numerous witnesses gave their version of what transpired and was said, we find it necessary for purposes of this opinion to detail only the substance of plaintiff's testimony. According to him, he was not certain whether the student was to have an "admit" slip or a "tardy" slip, and while he was discussing it with the student, defendant entered his office, started beating her fist on his desk and stated: "Mr. Stanley, I want you to know, did you ever see anything more ridiculous in your life than this girl down in the gym drawing a picture of a silly old red bird for the coach when she should have been in my history class?" Plaintiff stated that he did not reply, and that defendant next said: "I would like to know what this school system is coming to, anyway you are the poorest excuse for a principal I have ever seen in my life. You sit there all day long and write excuse after excuse. Excused. Excused. Excused. That's the only word you know how to write. In fact, I think you are plain stupid when you will sit and allow things like this to take place. In fact you are not qualified to be a principal. I have checked your record. You are a disgrace to the profession." These words shall hereinafter be referred to as the "first utterance."

After an exchange of words about taking the matter up with the school superintendent, and also reporting it to a member of the school board, plaintiff said he "would guarantee" that either he or defendant would "not be back next year," and to this defendant is said to have replied that it would be plaintiff who would be gone. At about this time one of the other teachers in the office remarked that defendant "had been under an awful strain" and "needed a rest," and, at this, plaintiff testified to an exchange of words as follows: "She said, 'What did you say to me all day yesterday in sympathy about my mother in the hospital?' I said: 'Miss Taylor, I didn't know who was in the hospital until Mrs. Gutekunst told me the one was your mother.' She said: 'I shouldn't have had to have told you. Everyone else knew it.' Again, she said: 'I still want to know. Did you ever see anything more ridiculous than this girl down in the gym drawing a picture of a silly old red bird for a coach when she should have been in my U.S. History class?' I said: 'Yes, Miss Taylor, I do know something more ridiculous.' I said: 'You left your classroom yesterday. You left the town without my knowledge as principal of this school district in full charge of administration in absence of the superintendent.' Then is when she said. 'You are just like that old Lee Harvey Oswald that shot and killed President Kennedy, and that old Jack Ruby who shot and killed him in Dallas.' I stood up and said: 'Miss Taylor, I may not be able to get you fired, but I'm taking this

before the Board of Education. I'm going to recommend revocation of your teaching certificate, and I'm going to push it all the way, because I don't think a teacher like you, that will talk and act like you are acting in the presence of these students has any business in a classroom.' Mr. Henderson and Mrs. Gutekunst, at that point, got her out of the office."

Continuing with the testimony of plaintiff, he stated that he then stepped to the door of defendant's classroom and told the students to be quiet until their teacher could return. He then apparently encountered defendant in an area we take to have been in a corridor outside the classroom and she reportedly stated: "I said it. I'm glad I said it and I say it again. You are nothing but a Lee Harvey Oswald and a Jack Ruby." Plaintiff testified that he then decided to monitor defendant's class, although he had never done so before, and while he was in her classroom he said to her: "I would like to get one thing straight. Did you compare me with Lee Harvey Oswald and Jack Ruby in Dallas, Texas?", to which she replied: "That's right, I did. The one that shot and killed the President, and the other shot and killed the other. It is people like you who think and act the way you think and act, that causes them to do all they did." The references to Oswald and Ruby shall hereinafter be referred to, collectively, as the "Oswald-Ruby" utterances.

We interject, in passing, that no witness testified precisely to having heard the utterances as testified to by plaintiff. In varying degrees, however, some corroborated in substance that the Oswald-Ruby comparison had been made, and that defendant had questioned plaintiff's qualification as principal. Defendant testified she could not remember what was said, and others testifying in her behalf stated they did not hear the utterances attributed to her, although in a position to do so.

The original complaint was filed November 23, 1964, and after long pleading delays the cause came to trial on the issues formed by a third amended complaint of two counts, and defendant's answer and affirmative defenses thereto. Both counts pleaded the "first utterance" in words substantially the same as plaintiff's testimony, and both also pleaded what appears to be a selected composite taken from the three "Oswald-Ruby utterances." Count I was based on a theory that both utterances were slander *per se*, while Count II was predicated on a theory that they were both slander *per quod* and alleged special damages. The distinction between the two theories is succinctly set forth in 33A I.L.P., Slander and Libel, par. 11, at Page 24, where it is said:

"Defamatory words may be divided into those words which are actionable *per se*, and those which are actionable *per quod*. The difference between defamatory words actionable *per se* and those which are

actionable *per quod* is that in those words which are actionable *per se* damages need not be specially proved and malice will be implied, whereas in those words which are actionable *per quod* only, malice and damages must be proved.

A publication is libelous *per se* if it is so obviously and naturally hurtful to the person aggrieved that proof of injurious character can be, and is, dispensed with. Words actionable *per quod* are those which require an innuendo to give them a slanderous or libelous meaning and require evidence to show that as a matter of fact some substantial injury has followed from their use."

See also: *Whitby v. Associates Discount Corp.*, 59 Ill.App.2d 337; *Ward v. Forest Preserve Dist.*, 13 Ill.App.2d 257.

At the conference on jury instructions plaintiff was permitted to file a fourth amended complaint which, for all practical purposes, was substantially the same as the third amended complaint, the only notable exception being that Count I prayed for punitive damages as well as general damages. (Since only a general verdict was returned, it is not possible to determine what part of the $75,775.00 verdict, if any, was awarded as punitive damages.) Plaintiff made an election to proceed only on Count I (slander *per se*), and as a consequence, the jury was instructed only on the issues thereunder. Following the unfavorable verdict, defendant filed a post-trial motion, subsequently denied, wherein she prayed that the judgment entered on the verdict be set aside and for judgment notwithstanding the verdict on grounds, *inter alia,* that the utterances were not actionable; that they were not slander *per se;* and that plaintiff failed to prove his case. The initial contentions of defendant on this appeal are essentially the same.

The defendant also contends on appeal that the trial court erred in its ruling on certain objections to evidence and on motions to strike testimony; that it was error to give certain of plaintiff's instructions and to refuse certain of defendant's instructions in view of instructions on the theory of both slander *per se* and slander *per quod* since the case was submitted solely on the theory of slander *per se;* that it was error to permit plaintiff to inject the issue of punitive damages in the trial after the *voir dire* examination of the jury and in absence of proof of actual damages resulting to plaintiff from the words allegedly uttered by defendant; that the verdict was so excessive as to be obviously the result of passion and prejudice and was not supported by the evidence. While we would tend to agree with certain of defendant's contentions as to trial errors if this cause were to be remanded, we believe, however, that on the record before us we are first required to determine whether

the record justifies entry of judgment on the basis that slander *per se* was properly alleged and proven.

■■ This Court has participated in reiterating what is sometimes described as the common law view, that, as a general rule, both written and spoken words falsely uttered about a person in the presence of others are slander *per se*: (1) If they impute to the person spoken of an unfitness to perform the duties of an office or employment; or (2) if they prejudice the person spoken of in his profession or trade (*Whitby v. Associates Discount Corp.*, 59 Ill.App.2d 337; 33A I.L.P., Slander and Libel, par. 21, p. 33). Based upon these criteria it is the contention of plaintiff that the utterance here were slander *per se*, permitting malice and damages to be implied, in that the "first utterance" falsely accused him of unfitness to perform his duties as principal, while the "Oswald-Ruby utterances" were "spoken in aggravation of the words challenging his professional competency" and tended to prejudice him in his profession. In our view, this approach is not only too simplistic, but is incorrect.

■■■ Looking first to the Oswald-Ruby utterances, it is to be observed that the common law does not give a right of action for all spoken words, even though they may be vituperative, derogatory and disparaging terms of abuse (*Wright v. F. W. Woolworth Co.*, 281 Ill.App. 495, 498). In our opinion these utterances, one of which was somewhat deliberately induced by plaintiff, were no more than heated "name-calling" which would be understood as such, and which had no tendency to defame plaintiff in his profession or to cause him to be looked upon with contempt, and for which no cause of action would lie (*Skolnik v. Nudelman*, 95 Ill.App.2d 293). At the very most, it is manifest that the Oswald-Ruby utterances were not actionable as slander *per se*, "In order to make words, either written or spoken of or concerning one engaged in a particular calling, actionable *per se*, they must have been used of the party in relation to his or her occupation." (*Campbell v. Morris*, 224 Ill.App. 569, 572; and see: *Wright v. F. W. Woolworth Co.*, 281 Ill.App. 495; *Reed v. Albanese*, 78 Ill.App.2d 53, 61). The Oswald-Ruby utterances were not specifically spoken of plaintiff in relation to his profession and, accordingly, were not actionable *per se* nor sufficient to support the jury's verdict.

■■ In considering the first utterance we must observe that the gravamen of an action for defamation is not the injury to the plaintiff's feelings, but damage to his reputation in the eyes of other persons (33A I.L.P., Slander and Libel, par. 11, p. 23). It has also been declared that while defamatory matter, printed and published, may be actionable

*per se,* the same words, orally spoken, would not be so, except as they occasion special damage (*Hotz v. Alton Telegraph Printing Co.,* 324 Ill.App. 1; *Ward v. Forest Preserve Dist.,* 13 Ill.App.2d 257).

As stated in 50 American Jurisprudence 2d, Libel and Slander, par. 12: "In determining whether defamation is actionable *per se,* without the pleading and proof of special damages, a distinction is drawn by many courts between written and spoken words, so that much that, when spoken, is not actionable without an averment of extrinsic facts or an allegation and proof of special damages, is, when written or printed, actionable *per se.* The courts base the distinction upon an alleged difference in the inherent characteristics of the two classes of imputations, it being said that the presumption that words are defamatory arises much more readily in cases of libel than in cases of slander. It has frequently been asserted, to explain the distinction, that written defamation is much more extensively and permanently injurious to character than verbal defamation, since it is more widely circulated; that it is, therefore, more aggravated and dangerous, as tending to breaches of the peace; and that the deliberation necessary to prepare and circulate a libel evinces greater malice in the defamer and is worthy of stricter punishment."

As we have noted, words which are in written or printed form are susceptible of wider circulation and hence capable of inflicting greater injury than those which are merely spoken. Defamation made in writing or print necessitates some measure of deliberation and so by its very nature imputes an evil or other devious intention in the writer (*Wright v. F. W. Woolworth Co.,* 281 Ill.App. 495, 498).

■■ While we have had occasion to review some of the principles, to which we have referred, relating to actions of libel *per se* in cases which were decided in this Court involving alleged written defamations (*Whitby v. Associates Discount Corp., supra*), we have noted certain observations respecting the distinction between libel and slander and have indicated that we might have been inclined to accept the distinction as the better rule (*Mitchell v. Peoria Journal-Star,* 76 Ill.App.2d 154, 159). We have referred to the distinctive treatment of slander and libel because it underscores the necessity of very careful analysis by the courts of oral statements asserted to be slanderous *per se.* Heretofore, we have had no specific case to determine, in which the record required that we test certain oral statements by reasonable analysis to determine if the statements could logically be classified as slanderous *per se.* The cause before us, however, we believe, illustrates the type of case in which a court should be required to examine very closely into the entire record surrounding the making of the alleged oral statements which are

contended to be actionable *per se,* and as a result of which it is contended there is no requirement for any proof of special damage. As a consequence, we have noted that the criticisms specifically leveled against the principal by the teacher in the conversation between them emphasized that all the teacher thought the principal did was "write excuses" and that by reason thereof defendant stated that plaintiff was "not qualified" to be a principal and that he was "a disgrace" to the profession. We have noted that the defendant at the time was nervous and overwrought by reason of lack of rest and apprehension about her mother's health. We have also noted that apparently what evoked the most heated reaction from plaintiff was defendant's response involving the assertion of the so-called Oswald-Ruby statement which, likewise, was apparently a hysterical outburst seeking to characterize plaintiff for not having consideration for defendant's mother. We note that thereafter plaintiff himself then talked about having defendant fired and that he would recommend revocation of her teaching certificate.

Taking plaintiff's testimony as true, and as a basis for our consideration, we have particularly noted that the exchange between plaintiff and defendant took place with very few persons within hearing, and that the statements made by defendant were spoken in a rather hysterical manner and under circumstances which would make it apparent to the observer that what was said was nothing more than an irrational argumentative characterization not worthy of serious consideration. While portions of the first utterance went beyond mere name-calling, and included reference to plaintiff in relation to his profession, we do not believe that the words were actionable *per se* under the circumstances of this case. This is not a situation where defendant made a deliberate communication to someone other than plaintiff such as the superintendent of schools or a similar individual with the direct intention of doing injury to plaintiff in his position and profession. As the record shows, the outburst was spontaneous and made directly to plaintiff and was obviously more thoughtless than anything else, and a considered evil intention to defame is not easily imputed therefrom. The entire incident stemmed from what started out as a criticism by defendant of plaintiff's policy of excusing students from class to engage in extracurricular activities. Defendant was a teacher with an interest in the proper functioning of the school and she was entitled to make fair criticism and comment in the area which she began to discuss. What transpired after that takes on the character of mere verbal abuse in which first the defendant and then the plaintiff charged each other with professional incompetence. We conclude that the exchange did not do damage to plaintiff's professional reputation in the eyes of the

persons who happened to be in position to hear and actually reflected adversely more on defendant as a result of her hysterical utterances. Each utterance would obviously be accepted by the other persons for what it was—simply "give and take" remarks in a personal quarrel between the participants. The record in this case shows no evidence of damage to plaintiff as a consequence of the making of these statements. ■■ Are we to say that any unguarded oral utterance made in the heat of an argument, if it contains words affecting fitness for the profession of a complainant, qualifies in all cases as slander *per se* and excuses the necessity of alleging and proving special damage, and likewise authorizes a jury to penalize a defendant with punitive damages solely on the strength of such an utterance irrespective of the circumstances? We do not believe that this is or should be the law. In our opinion the utterances under consideration in this case, as shown by the record, do not qualify *as slander per se.* Accordingly, the trial court should have entered judgment for defendant notwithstanding the verdict pursuant to defendant's motion.

Therefore, for the reasons stated, the judgment of the Circuit Court of Cass County is reversed.

Judgment reversed.

STOUDER, P. J., and SCOTT, J., concur.