**BROWN & WILLIAMSON TOBACCO CORPORATION, Plaintiff-Appellant,**

v.

**Walter JACOBSON and CBS, Inc., Defendants-Appellees.**

No. 82–2115.

United States Court of Appeals, Seventh Circuit.

Argued April 12, 1983.

Decided July 14, 1983.

Patrick W. O'Brien, Michael J. O'Rourke, Hope G. Nightingale, Mayer, Brown & Platt, Chicago, Ill., Martin London (argued), Todd Stern, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for plaintiff-appellant.

Lawrence Gunnels, Reuben & Proctor, Chicago, Ill., for defendants-appellees.

Before POSNER and COFFEY, Circuit Judges, and GRANT, Senior District Judge.*

POSNER, Circuit Judge.

This diversity suit brought by Brown & Williamson, the manufacturer of Viceroy cigarettes, charges CBS and Walter Jacobson with libel and other violations of Illinois law. Jacobson is a news commentator for WBBM–TV, a Chicago television station owned by CBS. The defendants moved to dismiss the complaint on a variety of grounds. Without writing an opinion the district court granted the motion "for the reasons set forth in defendants' memoranda," adding only: "to deny this motion would unduly restrict the freedom of the press and the right of a journalist to express opinions freely." Brown & Williamson appeals.

In 1975, Ted Bates, the advertising agency that had the Viceroy account, hired the Kennan market-research firm to help develop a new advertising strategy for Viceroy. Kennan submitted a report which stated that for "the younger smoker," "a cigarette, and the whole smoking process, is part of the illicit pleasure category.... In the young smoker's mind a cigarette falls into the same category with wine, beer, shaving, wearing a bra (or purposely not wearing one), declaration of independence and striving for self-identity. For the young starter, a cigarette is associated with introduction to sex life, with courtship, with smoking 'pot' and keeping late studying hours...." The report recommended, therefore, the following pitches to "young smokers, starters": "Present the cigarette as part of the illicit pleasure category of products and activities.... To the best of your ability, (considering some legal constraints), relate the cigarette to 'pot', wine, beer, sex, etc. *Don't* communicate health or health-related points." Ted Bates forwarded the report to Brown & Williamson. According to the allegations of the complaint, which on this appeal we must accept as true, Brown & Williamson rejected the "illicit pleasure strategy" proposed in the report, and fired Ted Bates primarily because of displeasure with the proposed strategy.

Years later the Federal Trade Commission conducted an investigation of cigarette advertising, and in May 1981 it published a report of its staff on the investigation. The FTC staff report discusses the Kennan report, correctly dates it to May 1975, and after quoting from it the passages we have quoted states that "B & W adopted many of the ideas contained in this report in the development of a Viceroy advertising campaign." In support of this assertion the staff report quotes an internal Brown & Williamson document on "Viceroy Strategy," dated 1976, which states, "The marketing efforts must cope with consumers' attitudes about smoking and health, either providing them a *rationale* for smoking a full flavor VICEROY or providing a means of

* Hon. Robert A. Grant of the Northern District of Indiana, sitting by designation.

*repressing* their concerns about smoking a full flavor VICEROY." The staff report then quotes a description of three advertising strategies. Although the description contains no reference to young smokers or to "starters," the staff report states: "B & W documents also show that it translated the advice [presumably from the Kennan report] on how to attract young 'starters' into an advertising campaign featuring young adults in situations that the vast majority of young people probably would experience and in situations demonstrating adherence to a 'free and easy, hedonistic lifestyle.'" The interior quotation is from another 1976 Brown & Williamson document on advertising strategy.

On November 4, 1981, a reporter for WBBM–TV called Brown & Williamson headquarters and was put in touch with a Mr. Humber in the corporate affairs department. The reporter told Mr. Humber that he was preparing a story on the tobacco industry for Walter Jacobson's "Perspective" program and asked him about the part of the FTC staff report that dealt with the Viceroy advertising strategy. Humber replied that Brown & Williamson had rejected the proposals in the Kennan report and had fired Ted Bates in part because of dissatisfaction with those proposals.

Walter Jacobson's "Perspective" on the tobacco industry was broadcast on November 11 and rebroadcast on November 12 and again on March 5, 1982. In the broadcast, Jacobson, after stating that "pushing cigarettes on television is prohibited," announces his theme: "Television is off limits to cigarettes and so the business, the killer business, has gone to the ad business in New York for help, to the slicksters on Madison Avenue with a billion dollars a year for bigger and better ways to sell cigarettes. Go for the youth of America, go get 'em guys .... Hook 'em while they are young, make 'em start now—just think how many cigarettes they'll be smoking when they grow up." Various examples of how cigarette marketing attempts "to addict the children to poison" are given. The last and longest concerns Viceroy.

The cigarette business insists, in fact, it will swear up and down in public, it is not selling cigarettes to children, that if children are smoking, which they are, more than ever before, it's not the fault of the cigarette business. "Who knows whose fault it is?" says the cigarette business. That's what Viceroy is saying, "Who knows whose fault it is that children are smoking? It's not ours."

Well, there is a confidential report on cigarette advertising in the files of the Federal Government right now, a Viceroy advertising, the Viceroy strategy for attracting young people, starters they are called, to smoking—"FOR THE YOUNG SMOKER .... A CIGARETTE FALLS INTO THE SAME CATEGORY WITH WINE, BEER, SHAVING OR WEARING A BRA...." says the Viceroy strategy—"A DECLARATION OF INDEPENDENCE AND STRIVING FOR SELF–IDENTITY." Therefore, an attempt should be made, says Viceroy, to "... PRESENT THE CIGARETTE AS AN INITIATION INTO THE ADULT WORLD," to "... PRESENT THE CIGARETTE AS AN ILLICIT PLEASURE ... A BASIC SYMBOL OF THE GROWING–UP, MATURING PROCESS." An attempt should be made, says the Viceroy slicksters, "TO RELATE THE CIGARETTE TO 'POT', WINE, BEER, SEX. DO NOT COMMUNICATE HEALTH OR HEALTH–RELATED POINTS." That's the strategy of the cigarette slicksters, the cigarette business which is insisting in public, "We are not selling cigarettes to children."

They're not slicksters, they're liars.

While Jacobson is speaking these lines the television screen is showing Viceroy ads published in print media in 1980. Each ad shows two packs of Viceroys alongside a golf club and ball.

The complaint charges that the broadcast made statements about Brown & Williamson that the defendants knew to be false and that not only were libelous per se and injurious to Brown & Williamson but also wrongfully interfered with Brown & Wil-

liamson's business relations and violated two Illinois statutes, the Consumer Fraud and Deceptive Business Practices Act, Ill. Rev.Stat.1981, ch. 121½, ¶¶ 261 *et seq.*, and the Uniform Deceptive Business Trade Practices Act, Ill.Rev.Stat.1981, ch. 121½, ¶¶ 311 *et seq.* We begin with the defamation count. Since the district court accepted all of the grounds for dismissal advanced by the defendants, we must decide whether any of these grounds—other than those abandoned in this court, as some have been—supports dismissal.

One ground is that the broadcast is not libelous per se. If it is not, the complaint does not state a claim under the Illinois common law of defamation (the parties agree that Illinois law governs all of the substantive issues in this diversity case) unless it adequately alleges special damage, which the district court found it did not.

Under traditional principles, a finding of libel per se ("per se" in defamation law meaning just that pecuniary damage—"special damage"—need not be proved) requires only that the defamatory character of the statement alleged to be libelous be apparent on the face of the statement, or in other words that "extrinsic facts" not be necessary to make the statement defamatory. (If the statement was that Mrs. Jones had given birth on January 11, 1939, the extrinsic fact necessary to complete the libel might be that Mrs. Jones had married the child's father the previous month.) The defendants admitted at oral argument that the fact that Walter Jacobson's broadcast did not mention Brown & Williamson by name was not an extrinsic fact in this sense. See *Hambric v. Field Enterprises, Inc.,* 46 Ill.App.2d 355, 359, 196 N.E.2d 489, 492 (1964); *Harwood Pharmacal Co. v. National Broadcasting Co.,* 9 N.Y.2d 460, 214 N.Y.S.2d 725, 174 N.E.2d 602 (1961). The reason for distinguishing between statements that are and statements that are not libelous on their face is that the impact of an apparently innocuous statement will be limited to the presumably small group of readers who know additional facts, so damage cannot be presumed but

must be proved. The Jacobson broadcast was not innocuous on its face, and the fact that Brown & Williamson was not mentioned by name is relevant not to whether the broadcast was libel per se but to the distinct question whether it would be understood as referring to Brown & Williamson rather than to someone else. The defendants do not deny it would be.

So the broadcast is libel per se in the traditional sense—unless the aspersions that it casts on Brown & Williamson's corporate character cannot be considered defamatory at all, which is hardly tenable. But Illinois has abolished the distinction between slander and libel and in the process has assimilated libel per se to the quite different concept of slander per se, rather than vice versa. E.g., *Mitchell v. Peoria Journal-Star, Inc.,* 76 Ill.App.2d 154, 158–60, 221 N.E.2d 516, 519–20 (1966); *Grabavoy v. Wilson,* 87 Ill.App.2d 193, 202, 230 N.E.2d 581, 585 (1967); *American Pet Motels, Inc. v. Chicago Veterinary Medical Ass'n,* 106 Ill.App.3d 626, 629 and n. 1, 62 Ill.Dec. 325, 328 and n. 1, 435 N.E.2d 1297, 1300 and n. 1 (1982). (*Stanley v. Taylor,* 4 Ill.App.3d 98, 104, 278 N.E.2d 824, 828 (1972), looks the other way, but is unclear as well as outnumbered.) Slander per se unlike libel per se depends on the character as well as completeness of the defamatory statement. Under traditional principles, an utterance is slander per se only if it imputes to the plaintiff (1) crime, (2) unchastity (if the plaintiff is female), (3) a loathsome disease, or (4) anything likely to discredit the plaintiff in his trade or business. Prosser, Handbook of the Law of Torts 756–60 (4th ed. 1971).

Jacobson's broadcast fits the fourth category. The defendants argue that since a cigarette company cannot survive in the long run if young people do not take up smoking, the broadcast will be understood in the business community as complimenting Brown & Williamson for its aggressive efforts to hook the young on smoking. But we doubt that a cigarette company could survive in the short run and thus be around to enjoy the long run if it flouted the

strong public policy against encouraging children to smoke, a policy expressed for example in the ban on cigarette television advertising in section 6 of the Public Health Cigarette Smoking Act of 1969, 15 U.S.C. § 1335. The Senate Report on the bill asked the FTC to include in the biennial reports on cigarette labeling and advertising that are required by section 8(a) of the Act, 15 U.S.C. § 1337(a), "an analysis of public opinion polls and other relevant information indicating the extent to which the American public, especially young people, have been made fully aware of the hazards of smoking ...." S.Rep. No. 566, 91st Cong., 1st Sess. 11 (1969), U.S.Code Cong. & Admin.News 1970, pp. 2652, 2662. The Report adds: "The committee cannot overstate its strong desire that the cigarette industry not only honor its statement carefully to limit print advertising so as not to appeal to youth, but that it will also exercise restraint in the overall use of print advertising and other forms of promotion." *Id.* See also Ill.Rev.Stat.1981, ch. 23, ¶¶ 2357–58, making it an offense to sell cigarettes to minors.

A modern American corporation, especially one owned by a foreign company (Brown & Williamson is the wholly owned subsidiary of an English conglomerate corporation), cannot proclaim "the public be damned" as its motto. If it openly defied the views passionately held by a substantial segment of the public, the Congress, and government agencies such as the FTC, it would be inviting serious trouble on many fronts. Obviously it would have been grossly defamatory for Walter Jacobson to have accused Brown & Williamson of poisoning children; yet that is what he did in effect—indeed in those words, though used figuratively rather than literally. It is irrelevant that some unreconstructed businessmen might approve of what Walter Jacobson accused Brown & Williamson of doing. "If the advertisement obviously would hurt the plaintiff in the estimation of an important and respectable body of the community, liability is not a question of majority vote." *Peck v. Tribune Co.,* 214 U.S. 185, 190, 29 S.Ct. 554, 556, 53 L.Ed. 960 (1909) (per Holmes, J.).

We have been assuming that in merging libel and slander Illinois merely extended the traditional categories of slander per se to written (or what is nowadays treated as the same thing, broadcast) statements. But those categories have long been thought anachronistic and two of them, in today's moral climate, are merely quaint. So it is not surprising that in the course of merging libel and slander the Illinois courts have altered the traditional categories. Chastity has been dropped; "loathsome disease" has been replaced with "a communicable disease which would exclude one from society"; and discrediting people in their trades or businesses has become two categories—"imput[ing] ... inability to perform or want of integrity in the discharge of duties of office or employment" and "prejudic[ing] a person in his profession or trade." *American Pet Motels, Inc. v. Chicago Veterinary Medical Ass'n, supra,* 106 Ill.App.3d at 629, 62 Ill.Dec. at 328, 435 N.E.2d at 1300. And even a statement that falls within one of those categories is not necessarily slander per se any more. The statement must be sufficiently defamatory to justify an award of damages without proof of actual damage. "Words are libelous *per se* if they are 'so obviously and naturally hurtful to the person aggrieved that proof of their injurious character can be, and is, dispensed with.'" *Id.,* quoting *Reed v. Albanese,* 78 Ill.App.2d 53, 58, 223 N.E.2d 419, 422 (1966). See also *Costello v. Capital Cities Media, Inc.,* 111 Ill. App.3d 1009, 1011, 67 Ill.Dec. 721, 723, 445 N.E.2d 13, 15 (1982).

Under contemporary as under traditional Illinois law, Jacobson's broadcast is libelous per se. Accusing a cigarette company of what many people consider the immoral strategy of enticing children to smoke—enticing them by advertising that employs themes exploitive of adolescent vulnerability—is likely to harm the company. It may make it harder for the company to fend off hostile government regulation and may invite rejection of the company's

product by angry parents who smoke but may not want their children to do so. These harms cannot easily be measured, but so long as some harm is highly likely the difficulty of measurement is an additional reason, under the modern functional approach of the Illinois courts, for finding libel per se rather than insisting on proof of special damage. In the *American Pet Motels* case the alleged libel consisted of a statement that persons who were not veterinarians had treated a cat at the plaintiff's pet "motel" for a parasite infection and that the state's attorney would be notified of the incident. The statement may have prejudiced the plaintiff in its business but the likely prejudice was too slight to dispense with proof of special damage. See 106 Ill.App.3d at 629, 62 Ill.Dec. at 328, 435 N.E.2d at 1300. The libel in the present case falls in one of the new as well as old per se categories—it prejudices the plaintiff in its trade—and it also has the required gravity.

But the defendants argue that Illinois has special and restrictive rules governing the defamation of a corporation. They cite a 1965 decision by this court which states that to allow a corporation to recover on a theory of libel per se under Illinois law "there must be a showing that it has been accused of fraud, mismanagement, or financial instability." *Continental Nut Co. v. Robert L. Berner Co.,* 345 F.2d 395, 397 (7th Cir.1965). For this statement, not further amplified in the opinion, the court cited only *Interstate Optical Co. v. Illinois State Soc'y of Optometrists,* 244 Ill.App. 158 (1927). Since the plaintiff in *Interstate Optical Co.* had been accused of unethical conduct rather than fraud in any financial sense, *Continental Nut* probably uses the word "fraud" in a broad sense; and, defined broadly, "fraud" describes the conduct that Walter Jacobson attributed to Brown & Williamson. The promotion of cigarettes to susceptible youngsters is analogous to overreaching—"fraud" in an acceptable sense—by a child's guardian. In *Continental Nut* a competitor accused the plaintiff of importing nuts that were not properly cured and would therefore shrink and become mouldy, and added that "somebody is going to be in trouble" if the Food and Drug Administration's inspectors determined that the nuts did not meet proper standards. 345 F.2d at 397. This was product disparagement, which as we shall see is a tort distinct from defamation; if there was defamation of the company, as distinct from disparagement of its product, it was far milder than in the present case.

No Illinois case before or after *Continental Nut* suggests that the standards for proof of defamation are different for corporations than for other plaintiffs. The cases treat corporate plaintiffs just like individuals. See, e.g., *Halpern v. News-Sun Broadcasting Co.,* 53 Ill.App.3d 644, 11 Ill. Dec. 454, 368 N.E.2d 1062 (1977). Obviously some types of defamation—imputations of unchastity, for example—are not applicable to corporate plaintiffs. Probably, therefore, this court's statement in *Continental Nut* that the plaintiff had to show "fraud, mismanagement, or financial instability" was an effort to summarize the types of defamation to which corporations are susceptible, rather than an assertion, without any basis in Illinois law, that corporations are disfavored plaintiffs in defamation cases. A corporation cannot have a reputation for chastity but it can have a reputation for adhering to the moral standards of the community in which it sells its products and if that reputation is assailed in a fashion likely to harm the corporation seriously the corporation has been libeled under Illinois law.

Although Brown & Williamson therefore did not have to plead special damage in order to resist dismissal of its defamation count, such damage, if proved, may of course be recovered in a per se as well as in a per quod suit. But "when items of special damage are claimed, they shall be specifically stated." Fed.R.Civ.P. 9(g). Whether this requirement is satisfied in a diversity case is a matter of federal rather than state law, for reasons explained in Note, *The Definition and Pleading of Special Damage Under the Federal Rules of*

*Civil Procedure,* 55 Va.L.Rev. 542, 553–58 (1969).

 The complaint states that "BROWN & WILLIAMSON has been injured and is likely to continue to suffer injury as a result of the natural tendency of the defendants' false and malicious statements to undermine BROWN & WILLIAMSON's general reputation for honesty and to decrease its sales and good will by falsely portraying the manufacturer of VICEROY cigarettes as immoral, degenerate and criminal. In addition, the defendants' continuing rebroadcast of the false and malicious Cigarette Advertising Broadcast threatens to destroy or nearly destroy the value of BROWN & WILLIAMSON's investment in VICEROY advertising between 1978 and 1981." The reference to injury through the natural tendency of the alleged libel to decrease Brown & Williamson's sales, and the reference to the danger that the value of Brown & Williamson's recent Viceroy advertising will be destroyed or nearly destroyed (perhaps implying that it has already been injured), may well be attempts to plead actual, realized pecuniary injury. But such special damage is not explicitly, and therefore not specifically, alleged. In *Continental Nut,* "plaintiff listed specific figures of its gross sales before and after the publication and averred that the decrease in sales was the 'natural and proximate result' of the letter," 345 F.2d at 397; and in *Fleck Bros. v. Sullivan,* 385 F.2d 223, 225 (7th Cir.1967), the plaintiff alleged that the libel had caused it to make an expenditure of money. Thus in both cases actual pecuniary damage was alleged, with enough if not great specificity. Although the Note in the *Virginia Law Review* proposes in effect to read the words, "shall be specifically stated," out of Rule 9(g), as being inconsistent with the notice-pleading philosophy of the Federal Rules, and there is judicial support for this approach, see, e.g., *Rannels v. S.E. Nichols, Inc.,* 591 F.2d 242, 247 (3d Cir.1979), we do not consider ourselves authorized to rewrite the rule. We are not even sure the requirement of specificity has no function. It enables groundless per quod defamation cases to be dis-missed at an early stage in the litigation; and although that policy is not applicable to this case we cannot ignore the unqualified command of the rule. *Barton v. Barnett,* 226 F.Supp. 375, 377–78 (N.D.Miss.1964), which supports our approach to the interpretation of Rule 9(g), was cited with approval by this court in *Grzelak v. Calumet Publishing Co.,* 543 F.2d 579, 583–84 (7th Cir.1975).

 But Brown & Williamson must be allowed to plead over (unless the dismissal of the complaint can be upheld on other grounds). The defendants' argument that by appealing from the district court's judgment dismissing the complaint rather than moving for leave to file an amended complaint Brown & Williamson elected to stand on the original complaint is untenable. Since the district court dismissed the complaint on a variety of grounds, only one of which related to special damage, the court would also have had to deny any motion to file an amended complaint for the purpose of curing the deficiency in the plea for special damage. The filing of such a motion would therefore have been futile, and was not required.

 The defendants also argue and the district court also found that the libel was privileged as a fair and accurate summary of the Federal Trade Commission staff's report on cigarette advertising. The parties agree as they must that Illinois recognizes a privilege for fair and accurate summaries of, or reports on, government proceedings and investigations. See *Lulay v. Peoria Journal-Star, Inc.,* 34 Ill.2d 112, 214 N.E.2d 746 (1966); *Halpern v. News-Sun Broadcasting Co., supra,* 53 Ill.App.3d at 644, 11 Ill.Dec. at 461, 368 N.E.2d at 1069. They agree that the privilege extends to a public FTC staff report on an investigation. But they disagree over whether Jacobson's summary of the FTC staff report was "fair," that is, whether the overall impression created by the summary was no more defamatory than that created by the original. See Restatement (Second) of Torts § 611, Comment f (1977). Since

this is a question of fact, *Newell v. Field Enterprises, Inc.*, 91 Ill.App.3d 735, 749, 47 Ill.Dec. 429, 441, 415 N.E.2d 434, 446 (1980); *Tunney v. American Broadcasting Co.*, 109 Ill.App.3d 769, 776, 65 Ill.Dec. 294, 299, 441 N.E.2d 86, 91 (1982), and the case was dismissed on the pleadings, all we need decide is whether the fairness of the Jacobson summary emerges so incontrovertibly from a comparison of the FTC staff report with the broadcast that no rational jury considering these documents with the aid of whatever additional evidence Brown & Williamson might introduce could consider the summary unfair.

Although the FTC report (and the Kennan report from which it quotes) refers to the targets of the Viceroy advertising campaign as "young smokers" and "starters," not as children, the broadcast implies that the campaign is aimed at children; for after quoting from the Kennan report as quoted by the FTC staff, Jacobson comments: "That's the strategy of the cigarette slicksters, the cigarette business which is insisting in public, 'We are not selling cigarettes to children.' They're not slicksters, they're liars." Also, although the quotations in the broadcast are from the Kennan report rather than from any document written inside Brown & Williamson, and this is clearly indicated in the FTC staff report, the broadcast implies that they are quotations from Brown & Williamson. For example, Jacobson states that "an attempt should be made, says Viceroy"—and there follow quotations from the Kennan report without identification of the true source. This is misleading. True, the FTC staff report does state that Brown & Williamson "adopted many of the ideas in" the Kennan report, and does not say which these were. But its quotations from Brown & Williamson's "Viceroy Strategy" paper imply that they were the ideas of repressing any concerns about the health hazards of smoking and of attracting young smokers by an advertising campaign associating smoking with a "free and easy, hedonistic lifestyle"; there is no suggestion that Brown & Williamson adopted Kennan's specific proposal, quoted by Jacobson, "to re-

late the cigarette to 'pot', wine, beer, sex," or to "wearing a bra." Jacobson also deleted the qualification, "considering some legal constraints," and omitted mention of the fact that the Kennan report had been written six years before and that the advertising campaign which the FTC staff thought based in part on that report had been conducted five years before. The omission was misleading because the juxtaposition of the audio portion of the broadcast with current Viceroy advertising implied that Viceroy was continuing to employ the disreputable methods recommended by the Kennan report (though the connection between golf and a strategy of enticing children is obscure).

The fact that there are discrepancies between a libel and the government report on which it is based need not defeat the privilege of fair summary. Unless the report is published verbatim it is bound to convey a somewhat different impression from the original, no matter how carefully the publisher attempts to summarize or paraphrase or excerpt it fairly and accurately. An unfair summary in the present context is one that amplifies the libelous effect that publication of the government report verbatim would have on a reader who read it carefully—that carries a "greater sting," *Tunney v. American Broadcasting Co., supra,* 109 Ill.App.3d at 775, 65 Ill.Dec. at 298, 441 N.E.2d at 90. The FTC staff report conveys the following message: six years ago a market-research firm submitted to Brown & Williamson a set of rather lurid proposals for enticing young people to smoke cigarettes and Brown & Williamson adopted many of its ideas (though not necessarily the specific proposals quoted in the report) in an advertising campaign aimed at young smokers which it conducted the following year. The Jacobson broadcast conveys the following message: Brown & Williamson currently is advertising cigarettes in a manner designed to entice children to smoke by associating smoking with drinking, sex, marijuana, and other illicit pleasures of youth. So at least a rational jury might interpret the source and the summa-

ry, and if it did it would be entitled to conclude that the summary carried a greater sting and was therefore unfair.

■ Brown & Williamson argues that even if the Jacobson broadcast fairly summarized the FTC staff report the defendants forfeited the privilege of fair summary because they knew that the staff report was false in a crucial particular—the assertion that Brown & Williamson had adopted many of the ideas in the Kennan report. The defendants reply that the mere fact that Brown & Williamson told their reporter that the assertion was false does not either make it false or mean they knew it was false. This is correct but we must assume for purposes of this appeal that Brown & Williamson can prove that the defendants knew the assertion to be false. The question is whether this would save the defamation count if the jury found that the broadcast was a fair summary after all.

■ In *Lulay v. Peoria Journal-Star, Inc., supra,* 34 Ill.2d at 115, 214 N.E.2d at 748, the Illinois Supreme Court adopted the formulation of the privilege of fair summary of government proceedings or reports in the first Restatement. In this formulation the privilege is forfeited if the summary is "made solely for the purpose of causing harm to the person defamed." Restatement of Torts § 611(b) (1938). This—the everyday—sense of malice is sometimes called "express malice" to distinguish it from "actual malice," which in the modern law of defamation means knowledge that a statement is false or reckless disregard for its truth or falsity. The first Restatement contains no suggestion that actual malice would defeat the privilege of fair summary of government reports, nor does *Lulay*; and the second Restatement, published after *Lulay,* deleted section 611(b), a change that implies that the draftsmen thought the privilege absolute. Restatement (Second) of Torts § 611 (1977). Yet in *Catalano v. Pechous,* 83 Ill.2d 146, 168–70, 50 Ill.Dec. 242, 252–53, 419 N.E.2d 350, 360–61 (1980), the Illinois Supreme Court appears to have treated the question whether the privilege is forfeited by proof of actual malice as

open. And in our recent decision in *Gertz v. Robert Welch, Inc.,* 680 F.2d 527, 535 (7th Cir.1982), and the Illinois Appellate Court's recent decision in *Tunney v. American Broadcasting Co., supra,* 109 Ill.App.3d at 775, 65 Ill.Dec. at 298, 441 N.E.2d at 90, *Catalano* is cited as authority for the proposition that the privilege is forfeited by such proof. Both these decisions can be criticized, however, for having read more into *Catalano* than can fairly be found there; and though we are bound by authoritative state court rulings on matters of state law whether or not we consider those rulings well reasoned, we are not bound to follow a state intermediate appellate ruling (*Tunney*) that is inconsistent with a state supreme court ruling (*Lulay*). But besides *Tunney* there is *Halpern v. News-Sun Broadcasting Co., supra,* 53 Ill.App.2d at 653–54, 11 Ill.Dec. at 461, 368 N.E.2d at 1069, which preceded *Catalano* and which held that actual malice is evidence of express malice—though maybe only when the summary is inaccurate.

■ The truth is that Illinois law is in disarray on the question whether actual malice defeats the privilege of fair summary. This is not surprising; it is a difficult question. The facts of *Gertz* illustrate the case for using actual malice to defeat the privilege in at least some circumstances. The plaintiff there had been described as a "Communist-fronter," "Leninist," and "Marxist" in a long and radically uncomplimentary article about him in the defendant's magazine. Only one statement in the article—that the plaintiff had been a member of the National Lawyers' Guild—was even arguably a fair summary of material appearing in a government document (a 1951 report of a congressional committee), and it was with reference to that statement alone that we held that the privilege was forfeited if publication had been with actual malice. See 680 F.2d at 537. If you embellish a defamatory statement with accusations you know to be false, taken from ancient government reports that have no claim to contemporary credence, your repetition of those stale accusations is not privi-

leged; that is as far as *Gertz* need be interpreted to go.

Suppose instead that a newspaper merely publishes without comment the daily transcript of a sensational criminal trial. The transcript includes scurrilous accusations against the defendant which the newspaper's staff believes to be false and which are in fact false, as shown by the fact that not only is the defendant acquitted but the prosecutor later apologizes for having prosecuted an innocent man. It is unclear that the privilege of republishing government documents (which a trial transcript is, in effect) in fair and accurate fashion would be forfeited in such a case. The trial would be newsworthy and the newspaper could reasonably believe that its readers ought to be allowed to form their own conclusions regarding the truth of the accusations. In such a case the Illinois courts might—the very recent decision in *Emery v. Kimball Hill, Inc.,* 112 Ill.App.3d 109, 114, 67 Ill.Dec. 767, 770, 445 N.E.2d 59, 62 (1983), suggests they would—hold that the privilege was not forfeited; and if they held it was, a serious First Amendment question would be raised. But we need not decide on this appeal whether or when the privilege to republish government reports is forfeited by proof of actual malice. The issue will become moot if the jury finds that the Jacobson broadcast was not a fair summary of the FTC staff report, as well it may. We merely express our doubts that *Gertz* goes as far as a quick reading of our opinion in that case might appear to indicate or that *Tunney* and *Halpern* are authoritative on the question whether actual malice always forfeits the privilege of fair summary of government documents.

Apart from concern that blanket recognition of an actual-malice exception to the privilege of summarizing government documents might make it difficult for the media to keep the public abreast of government activity—which may be the concern behind the district court's brief allusion to the First Amendment—there are no First Amendment issues before us on this appeal. The defendants do not argue that as a large corporation Brown & Williamson is a "public figure." See *Bruno & Stillman, Inc. v. Globe Newspaper Co.,* 633 F.2d 583, 586–93 (1st Cir.1980), and cases cited there, on the general question. Whether they have waived any such argument by their silence is not a question we need decide here, but we observe in passing that if the purpose of the public figure-private person dichotomy is to protect the privacy of individuals who do not seek publicity or engage in activities that place them in the public eye, there seems no reason to classify a large corporation as a private person. (The First Circuit rejected this argument in *Bruno & Stillman,* however; see 633 F.2d at 590.) But at least for purposes of this appeal Brown & Williamson is a private person, and as such its way is not barred by the First Amendment provided that it does not advance a theory of strict liability and does not seek general and punitive damages without being prepared to prove actual malice. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 347, 349–50, 94 S.Ct. 2997, 3010, 3011–12, 41 L.Ed.2d 789 (1974). It does seek such damages but is prepared to prove actual malice; and Illinois law requires proof of negligence in defamation cases as the minimum condition for establishing liability. See *Gertz v. Robert Welch, Inc., supra,* 680 F.2d at 537 n. 17. Of course if Brown & Williamson does prove actual malice it can recover damages —actual, general, and punitive—even if it is a public figure.

This completes our discussion of the defamation count and we turn to the others, which were also dismissed—and which are makeweights that require only brief discussion. If one person persuades another to break a contract with a third, he commits the tort of wrongful interference with business relations. *City of Rock Falls v. Chicago Title & Trust Co.,* 13 Ill.App.3d 359, 300 N.E.2d 331 (1973). Any libel of a corporation can be made to resemble in a general way this archetypal wrongful-interference case, for the libel will probably cause some of the corporation's customers to cease doing business with it; and wheth-

er this involves an actual breaking of contracts or merely a withdrawal of prospective business would make no difference under the modern law of wrongful interference. But this approach would make every case of defamation of a corporation actionable as wrongful interference, thereby enabling the plaintiff to avoid the specific limitations with which the law of defamation—presumably to some purpose—is hedged about. We doubt that the Illinois courts would allow this end run around their rules on defamation, and we therefore need not consider any constitutional implications of their doing so. *Crinkley v. Dow Jones & Co.*, 67 Ill.App.3d 869, 880, 24 Ill.Dec. 573, 581, 385 N.E.2d 714, 722 (1978), is instructive. The court dismissed the wrongful-interference counts in a suit, not unlike the present one, against a publisher because there was no allegation that the defendant *intended* to interfere with the plaintiff's relationship with third parties. This was a pleading point but it is evident that Brown & Williamson does not believe that the defendants' interest was otherwise than to attract viewers to Jacobson and CBS; the complaint alleges that the broadcast was "designed solely to increase the audience ratings of and attract attention to WBBM-TV."

*Crinkley* also disposes of Brown & Williamson's claim that the defendants violated the Illinois Consumer Fraud and Deceptive Business Practices Act and the Uniform Deceptive Trade Practices Act. See 67 Ill.App.3d at 877, 24 Ill.Dec. at 578–79, 385 N.E.2d at 719–20. These Acts provide a remedy for disparagement of a product, but that is different from the disparagement of the producer, i.e., from defamation. The Jacobson broadcast does not suggest that Viceroy cigarettes are defective, or any more unhealthful than other brands of cigarettes; so there is no product disparagement, and we need not decide whether, if there were, it would be actionable when the disparagement was by the news media rather than by a competing producer.

The judgment dismissing Count I of the complaint (defamation) is reversed and the case is remanded for further proceedings consistent with this opinion. The judgment dismissing the other counts is affirmed. There will be no award of costs in this court, and Circuit Rule 18 shall apply on remand.