450 So.2d 1130 (1984)
John H. JAMASON, Appellant,
v.
PALM BEACH NEWSPAPERS, INC., Etc., et al., Appellees.
No. 83-1557.
District Court of Appeal of Florida, Fourth District.
April 4, 1984.
Rehearing Denied July 2, 1984.
Douglas E. Thompson of Farish, Farish & Romani, West Palm Beach, for appellant.
Talbot D'Alemberte, Miami, and L. Martin Reeder, Jr., of Steel Hector Davis Burns & Middleton, West Palm Beach, for appellees.
GLICKSTEIN, Judge.
This is an appeal by the police chief of West Palm Beach, Florida, from a summary final judgment entered in favor of the newspapers and their employees whom he had sued for libel. We affirm.
The trial judge patiently took the time to tell us in the summary final judgment which route he took to arrive at the destination in question, saying:
The grounds upon which this Summary Judgment is granted are:
1. The aforementioned articles were fair and accurate summaries of sworn testimony given by a police officer in a deposition taken in a judicial proceeding.
2. The articles were privileged as neutral reports or republications about a matter of great public concern.
3. The articles are protected by the principles of free speech embodied in the First Amendment and Plaintiff, as a public official, has been unable to offer any evidence, much less clear and convincing evidence, of actual malice.
The news items referenced in Paragraphs six through eleven of the Complaint essentially reiterate the information reported in the news article written by Mr. McEvoy and referenced in Paragraph 5 of the Complaint and attached as Exhibit A. This Court has already entered summary judgment for Defendants on Mr. McEvoy's article and the same legal principles set forth in that Order apply here.
Plaintiff's attempt to show actual malice based on the deposition testimony of reporters Wharton and Krueger is misguided. Those reporters testified they did not "believe" Jamason was guilty of taking bribes. However, it is apparent from the depositions and affidavits of those witnesses that they had no objective basis for determining the truth or falsity of Aurilio's allegations as stated *1131 by Nazzaro. Edwards v. National Audubon Society, Inc., 556 F.2d 113 (2d Cir.1977). The actual malice test does not impose liability on the basis of subjective opinion or uninformed impressions, but requires Plaintiff to show Defendants knowingly published a lie or recklessly disregarded the truth. Plaintiff's evidence in this case falls far short of that standard.
The record established that in the course of discovery in certain criminal cases that arose out of an investigation of organized crime, a defendant's lawyer deposed Agent James Nazzaro of the Palm Beach County Sheriff's Department's Organized Crime Bureau. Nazzaro testified at his deposition that a confidential informant had told him there was official corruption among local police departments, naming Chief Jamason, as well as a recently retired sheriff's department inspector, and another police chief from a city in Palm Beach County as corrupt officials. The informant had given information that these men were "on the take."
The Evening Times investigative reporter, George McEvoy, knew of an ongoing investigation of organized crime and gambling in Palm Beach County; and that at least one local law enforcement official had been implicated. When the Nazzaro deposition was filed in court, McEvoy obtained a copy of it from an assistant state attorney and made copies of excerpts from the deposition. Before publishing any stories about the allegations, McEvoy questioned the assistant state attorney and a sergeant of the Organized Crime Bureau concerning them. The sergeant was in charge of the Bureau which was investigating the allegations of the confidential informant, Linda Aurilio, the wife of a person associated with a gambling operation. McEvoy knew Aurilio's information had been the basis for certain wiretap authorizations.[1] The sergeant indicated to McEvoy that Aurilio's information had generally proved accurate; but they did not believe her allegations against Jamason. The assistant state attorney and the sergeant urged McEvoy not to publish anything about the bribery allegations against Jamason because they had no evidence to support them.
The following day McEvoy published a news article in The Evening Times, headlined "Top-Ranked Policeman Took Bribes from Gamblers, Informant Claiming." Chief Jamason's picture appeared on the face page of the article. The article quoted directly from Nazzaro's deposition that Aurilio had information Jamason was on the take. The article did not mention Aurilio's convictions for prostitution or that she had been involved in other crimes. Six additional articles on the same subject were thereafter published by the two newspapers.
Before publication of the first article, McEvoy met with four high level editorial personnel of the two newspapers and with general counsel of the publisher. McEvoy's story reasonably could have appeared the previous day; but the consensus of those with whom McEvoy consulted was that the butts of the allegations should have a chance to comment and their comments should appear in the same article. The sergeant and the assistant state attorney would not comment for publication on the ground the investigation was in process; however the two police chiefs' denials of the allegations were obtained and featured prominently in a box just below the headline. The cutline below Jamason's picture said "Chief Jamason ... flat denial." The retired inspector could not be reached for comment.
In the follow-up stories, Aurilio's prostitution record, her participation in a methadone program, her status as a murder suspect, and attempted impeachment of her by the gambling ring defendants were reported. *1132 When the investigating sergeant subsequently testified he believed Jamason innocent, the newspapers prominently reported this testimony.
Chief Jamason, having been accused by a confidential informant of what should be  by appropriate criminal penalty  one of the worst of all allegations against a public official; namely, that he is "on the take," claims that he should have recourse against the newspapers and their employees for having reported, in essence,[2] what the deposed witness said he had been told.[3]
Assuming the falsity of the informant's statement for the purpose of this opinion, Jamason's salvos were fired in the wrong direction; namely, at those who accurately reported the deposition testimony of the witness, Nazzaro, who answered, "Right," when asked:
Q. But did she [Aurilio] give you information that Chief Jamason is on the take, [name] is on the take, and [name] is on the take; is that correct, Sir?
It was Aurilio who verbalized the accusation  and the appropriate focus of appellant's claim  not those in this chain of information who respectively responded to a specific question asked under oath during pre-trial discovery in a criminal proceeding and accurately reported such response. Under such circumstances the law properly does not provide a remedy for an arguably innocent party against others who are unquestionably free of wrongdoing. The law explains this common sense freedom from recovery in such setting by considering that reporting as privileged. In the case before us, the witness  having subjected himself to a number of sanctions once taking the oath to tell the truth  repeated under oath what was said to him about the appellant police chief, admittedly a public official. Nazzaro's testimony was absolutely privileged. See Farish v. Wakeman, 385 So.2d 2 (Fla. 4th DCA), dismissed, 394 So.2d 1151 (Fla. 1980); Sussman v. Damian, 355 So.2d 809 (Fla. 3d DCA 1977).
Appellees' privilege was qualified; that is, it was incumbent upon them to report what appeared in the deposition in an accurate, fair and impartial manner. See Walsh v. Miami Herald Publishing Co., 80 So.2d 669 (Fla. 1955), which said succinctly:
This statement merely means that the report of judicial proceedings must be correct.
Id. at 671. The newspaper of 1984 has a number of roles known best to its owners and operators. For the rest of us in society who know little of their operations, newspapers serve two extremely valuable services  to provide information to the public quickly and correctly in the news columns and to serve as the conscience of the community on their editorial pages. When an affidavit, pleading, deposition or oral testimony emanates from the county courthouse in a judicial proceeding, it is incumbent upon the media that their report of its contents be clearly accurate. Whether the press reports the item on page one with a banner headline or on the last page of the last section is an editorial decision, not a legal one. Accordingly, if Citizen Kane were running the Daily So-and-So and desired to equate someone's accusatory testimony in a judicial proceeding with the proclamation of the end of World War II, that is a matter for the editor's discretion not a jury's. Thus, while the editorial board of a responsible newspaper should inspire us daily to commit our individual energy in the direction of making the world better than it is, the editor must answer to his own sense of fairness in deciding how prominently to report what occurs in the courtroom.
Actual malice, as discussed by the trial court, which of course is the threshold which public officials must meet in seeking *1133 recovery for libel, comes into play in the reporting of a judicial proceeding only when the press strays or deliberately bolts outside the hound's tooth requirement of accuracy. The rule emerged in New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), which equated actual malice with knowledge of the falsity of the published statement or with reckless disregard of its truth or falsity. Frankly, we fail to see how actual malice is pertinent to an accurate report of a judicial proceeding. Accordingly, we do not see the appropriateness, in the setting here, of a lengthy intellectual massage on the law of actual malice, other than to say that there is clearly none of that venom in the record of this case. Far less "clean" reporting than occurred in this case has passed muster under the actual malice test. See Time, Inc. v. Pape, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971); Greenbelt Cooperative Publishing Ass'n v. Bresler, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970); Tavoulareas v. Washington Post Co., 567 F. Supp. 651 (D.D.C. 1983). Moreover, we feel it unnecessary to venture into a discussion of neutral reporting of matters of great public concern, discussed in Edwards v. National Audubon Society, Inc., 556 F.2d 113 (2d Cir.), cert. denied, 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977). This case concerns only the accurate reporting of an occurrence in a judicial proceeding. The newspaper, had it wished, could have devoted the entire issue to the statement without any effort to neutralize the accusation by giving the accused the opportunity to deny. The question then becomes how well does the editor sleep with his own conscience, which again is our concern as human beings desirous of a fair world, not as judges resolving a legal issue. Newspaper editors should be, in today's world, the modern Diogenes, making sure that only an honest man holds office as a public official. In doing so, the editor is the surrogate for the rest of us who extend our trust to all in public employment at every level.
In closing, we observe that bribery or other corruption of or by a public servant[4] is, for reasons known only to the legislature, just a third degree felony punishable with a maximum term of five years[5]  and no mandatory minimum. It strikes us that if the stakes were substantially higher, newspapers would have far less to print about public officials exchanging pin stripes for pen stripes.
ANSTEAD, C.J., concurs.
LETTS, J., concurs specially with opinion.
LETTS, Judge, concurring specially.
I have sympathy for Chief Jamason but I cannot rule for him. I think the Evening Times showed bad taste in publishing that which it had good reason to suspect was untrue knowing full well it would embarrass a public official. However, bad taste is not libel and all the citations in Judge Glickstein's opinion, to which I would add one more, mandate our decision. See Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).
NOTES
[1] McEvoy's deposition reflects his testimony that he "knew" Aurilio was not available nor was her statement. Specifically, he said that he had been informed there was an ongoing investigation; and that he believed that "the Federal people had her." Appellant's counsel controverted the latter contention at the time of deposition, indicating that she was not in protective custody.
[2] We find no merit in appellant's contention that the published articles by using the words "bribe" and "bribery" changed the meaning of Nazzaro's words. "On the take" means "taking a bribe."
[3] Nazzaro did not recall if Aurilio was under oath when she made the subject statement about Jamason.
[4] See section 838.016, Florida Statutes (1983).
[5] See section 775.082(3)(d).