Thomas J. LAVIN, Appellant

v.

NEW YORK NEWS, INC., D.J. Saunders,
Paul Meskill, Robert Hunt, James G.
Wieghart, Larry Layout and Harry
Headliner, Charles Voss and Robert Sa-
pio.

No. 83–5899.

United States Court of Appeals,
Third Circuit.

Argued July 19, 1984.

Decided March 26, 1985.

Joseph J. Fleischman, Hannoch, Weisman, Stern, Besser, Berkowitz & Kinney, P.A., Newark, N.J., Michael B. Mukasey (argued), Patterson, Belknap, Webb & Tyler, New York City, for appellees.

Thomas D. Ruane (argued), Ribis, McCluskey, Ruane & Graham, Short Hills, N.J., for appellant.

Before SLOVITER and BECKER, Circuit Judges, and FULLAM, District Judge.[*]

## OPINION OF THE COURT

FULLAM, District Judge.

In this appeal from a grant of summary judgment dismissing a libel case, we are again required to address issues involving New Jersey's fair report privilege, recently canvassed in *Schiavone Construction Co. v. Time, Inc.*, 735 F.2d 94 (3d Cir.1984).

In *Schiavone*, we reversed a dismissal under Fed.R.Civ.P. 12(b)(6), because it could not properly be ruled as a matter of law that plaintiff would be unable to estab-

lish abuse of the fair report privilege on the part of the defendants. The present case was decided on cross-motions for summary judgment; coincidentally, by the same district judge whose decision was reviewed in *Schiavone*.

### I. FACTS

Plaintiff is a Bayonne, New Jersey, police official who claims to have been defamed by an article appearing in the March 7, 1983 edition of the "New York Daily News".

It appears that, over the course of several years, the FBI conducted a far-reaching investigation of organized crime activities in the New York-New Jersey area, particularly along the waterfront. In the course of that investigation, in May 1982, an FBI agent applied to a federal judicial officer in the Southern District of New York for a search warrant, and in support of the application, presented the court with a 165-page affidavit outlining the results of the investigation. Approximately 6½ pages of the affidavit, under the heading "Police Corruption", discussed the allegedly improper relationships between persons associated with organized crime ("the DiGilio Group") and members of the Bayonne, New Jersey Police Department. The affidavit and related papers remained under seal until some time around October of 1982; upon expiration of the district court's impoundment order, the affidavit and related papers became matters of public record.

A reporter for the defendant newspaper first became aware of the affidavit and its contents in early March 1983. The newspaper account claimed by plaintiff to be defamatory was based, in large part, upon the affidavit. The page 1 headline reads:

"THE MOB:

"BEST COPS MONEY CAN BUY

"Second of series, page 5"

At the top of page 5 of the newspaper appeared the four-column headline: "BEST

---

[*] Hon. John P. Fullam, United States District Court for the Eastern District of Pennsylvania, sitting by designation.

COPS MONEY CAN BUY". Immediately beneath the headline, on the left, appeared a two-column photograph of plaintiff and another police official, both identified by name and title. To the right of this photograph, the two-column text of the newspaper article begins. In pertinent part, the text of the article reads as follows:

"FBI agents who investigated New York mob operations in New Jersey concluded that the city of Bayonne has the best police force money can buy.

"The six-year probe focused on criminal activities of the DiGilio Group, a Bayonne-based mini-mob....

"Results of the investigation were described in a 165-page affidavit filed in federal court to support a request for search warrants authorizing FBI agents to seize evidence from mob members, their homes and offices.

"In the affidavit, FBI agents reported: 'The evidence developed during the electronic surveillance (of DiGilio and his crew) established that DiGilio is able to conduct his various criminal activities with a significantly diminished risk of detection because he and some of his associates have developed a corrupt relationship with certain police officials.'

"The Daily News obtained a copy of the affidavit. Much of the information in it was obtained from electronic surveillance of gang members and from several inside 'sources', or informers, who were members of the DiGilio Group.

"The FBI papers said two of these sources 'separately reported that Bayonne Public Safety Director James Sisk received bribe payments from DiGilio.'

"The affidavit also mentioned Deputy Police Chief Thomas Lavin, Commander of the Bayonne Police Department's Detective Bureau, and Detective Peter Dugan."

Next appeared two paragraphs relating to the DiGilio Group, Sisk, and others. The only further references to plaintiff are these:

"In interviews with The News, the three Bayonne police officers and Cona-

ghan denied the allegations and insisted they had never been involved in bribe-taking or other wrongdoing."

. . . . .

[A reference to an electronically recorded conversation in which a crime figure is reported to have stated that a Bayonne police officer who was attempting to gather evidence against the DiGilio Group was being punished by the Department to discourage such activity "because ... Lavin and everyone in the Police Department were giving the officer the cold shoulder".]

"Interviewed by The News in Sisk's office at the Bayonne Municipal Building, Sisk and Lavin both denied accepting bribes or doing favors for DiGilio. They said they had been investigating him and his associates since 1968.

. . . . .

" 'We brought DiGilio to the FBI's attention', Lavin said. 'We were the first to investigate DiGilio. There's no way a relationship exists between him and us....' "

Plaintiff argues that the combined effect of the headlines and the photograph is an accusation that plaintiff was guilty of taking bribes; and that the text of the article in its entirety amounts to a statement that the FBI agents, in an official document, had accused plaintiff of taking bribes. In plaintiff's view, the FBI affidavit, fairly read, does not accuse him of taking bribes; and the only factual references to plaintiff in the affidavit are entirely consistent with the proper and legitimate performance of his duties as head of the Internal Affairs Division of the Police Department, charged with investigating complaints against or about police officers.

In an oral ruling from the bench, the district court granted defendant's Motion for Summary Judgment. Plaintiff appeals.

## II. *DISCUSSION*

■ The substantive law to be applied is that of New Jersey. As in *Schiavone, supra,* the parties have assumed as much,

and we see no reason to adopt a different approach. Moreover, on the controlling issues, we are aware of no significant difference between New Jersey law and that of any other state whose law might conceivably be relevant.

On the other hand, the standards for granting summary judgment pursuant to Fed.R.Civ.P. 56 are matters of federal law. In this case, the bench opinion of the district judge can reasonably be interpreted as expressing the view that, because of First Amendment concerns, summary judgment is more easily obtainable by a media defendant in a defamation case than by defendants in other cases.[1] We reject that approach. A substantial dispute of material fact does not disappear merely because a media defendant is being sued, or because a public official is the plaintiff; and plaintiff's right to a jury trial is entitled to no less respect. Proper application of the fair report privilege fully vindicates the defendants' First Amendment rights; carving out exceptions to Fed.R.Civ.P. 56 is neither permissible, nor helpful.

Although the district court may have applied an erroneous standard in ruling on the summary judgment motion, we can nevertheless affirm if our review of the record yields the conclusion that application of the proper standard would produce the same result. That is, we must determine whether there is any material dispute of fact which, if resolved in plaintiff's favor, would support the imposition of liability against the defendants.

 It is conceded that the newspaper article was, and purported to be, an account of what appeared in the FBI affidavit; and that this affidavit was an official, public, document. In short, everyone agrees that the fair report privilege is applicable. The question is whether the privilege was abused.

The privilege extends to an "accurate, complete, and fair abridgement" of the official document. *See Schiavone, supra,* 735 F.2d at 97; *Medico v. Time, Inc.,* 643 F.2d 134 (3d Cir.), *cert. denied,* 454 U.S. 836, 102 S.Ct. 139, 70 L.Ed.2d 116 (1981). Conversely, the privilege is abused, and therefore lost, if the account is inaccurate, misleadingly incomplete, or unfair. Whether abuse of the privilege has been shown is ordinarily a question for the jury, "unless the facts are such that only one conclusion can reasonably be drawn". Restatement (Second) of Torts § 619(2) comment b; *see also Coleman v. Newark Morning Ledger Co.,* 29 N.J. 357, 382, 149 A.2d 193, 206 (1959).

 The Restatement (Second) of Torts has been largely adopted as the law of New Jersey in this area:

> "It is not necessary that [the account] be exact in every immaterial detail.... It is enough that it conveys to the persons who read it a substantially correct account of the [contents of the official document].
>
> "Not only must the report be accurate, but it must be fair. Even a report that is accurate so far as it goes may be so edited and deleted as to be misleading. Thus, although it is unnecessary that the report be exhaustive, it is necessary that nothing be omitted or misplaced in such a manner as to convey an erroneous impression to those who heard or read it, as for example ... the use of a defamatory headline in a newspaper report, qualification of which is found only in the text of the article."

Restatement (Second) of Torts § 611, comment f (1977), *quoted in Reilly v. Gillen,* 176 N.J.Super. 321, 328, 423 A.2d 311, 315 (App.Div.1980). A fair distillation of the standard is this: Do the affidavit and the

---

1. The district court ruling included the following statements: "I will agree with you that the information in the affidavit does not go as far as Lavin is concerned as it goes against Sisk and perhaps others. And it may well be that this configuration had an effect of giving somebody an idea there was more pejorative mention of Lavin in the FBI affidavit than there really was. [A29] ... I think we would defeat the whole purpose of a constitutional protection if judges, because of a fear that there might possibly be somebody in the world who would disagree with them, are reluctant to grant summary judgment." [A31]

article have equal "sting"? *See Brown and Williamson Tobacco Corp. v. Jacobson,* 713 F.2d 262, 271 (7th Cir.1983); *Molnar v. Star Ledger,* 193 N.J.Super. 12, 471 A.2d 1209 (App.Div.1984).

Upon careful comparison of the offending article and the FBI affidavit, certain arguable differences are discernible. The newspaper article can be interpreted as asserting that the FBI affidavit accused plaintiff of accepting bribes.[2] Actually, the only direct statements in the FBI affidavit on the subject of bribery involve Sisk and another officer, not this plaintiff.

Viewed in isolation, the headlines appear to be statements of the defendant newspaper, not a reference to the contents of an official document. And the words "BEST COPS MONEY CAN BUY" do not appear in the FBI affidavit; indeed, the affiant did not purport to measure the extent of corruption, or express any comparisons between the Bayonne Police Department and other police departments.

The question is whether these discrepancies suffice to enable a reasonable factfinder to conclude that the article is not a fair, accurate, and complete reflection of the FBI affidavit. In answering that question, it is appropriate to point out that, although the FBI affidavit does not actually state that plaintiff was guilty of accepting bribes, it does contain other accusations against plaintiff which are not referred to in the newspaper article. The affidavit recounts wiretap evidence of telephone conversations between plaintiff and Gallagher (allegedly the DiGilio "bagman"), and between Gallagher and DiGilio referring to plaintiff, a late-night visit by plaintiff to Gallagher's home, etc., which strongly support the FBI's stated conclusion that the DiGilio group was being protected by the Bayonne police, and that plaintiff was an integral part of that corrupt relationship.

■ In the final analysis, the issue is not whether the affidavit included direct evidence of the payment of money to plaintiff, but whether, fairly read, the affidavit asserts that the FBI had concluded that plaintiff was corrupt. In our view, the affidavit undoubtedly amounts to an assertion that plaintiff was directly involved in a corrupt relationship with members of organized crime in the Bayonne, New Jersey, area.

■ We hasten to add that, given the present procedural posture of the case, we must assume that the FBI affidavit was false in every particular, and that plaintiff was and is entirely innocent, and was merely carrying out appropriately his duties as head of the Internal Affairs Department. But whether the FBI agents misinterpreted the situation, had incorrect information, or even consciously misstated the facts in the affidavit, there can be no liability on the part of the defendants for republishing the contents of an official document, so long as their account is reasonably accurate and fair. We hold, as a matter of law, that it was.

Arguably, the headlines should have made clear that the characterization "BEST COPS MONEY CAN BUY" was being attributed to the FBI, rather than the defendant newspaper itself. On the other hand, the front-page headline does not, by any stretch of the imagination, implicate plaintiff. The page 5 headline, together with the photograph, does implicate plaintiff, but its meaning is immediately clarified by

---

**2.** Judge Sloviter believes that the newspaper article, fairly read, cannot reasonably be interpreted as asserting that the FBI's affidavit accused plaintiff of accepting bribes. Nothing affirmatively states that the FBI ever made such an accusation and the article is specific in identifying which officers were accused of taking bribes and Lavin's name was not among them. She believes that the only reasonable conclusion that can be drawn from that omission is that Lavin was not named in the affidavit as a bribetaker because, if he had been, the article surely would have stated that. However, even assuming arguendo that the juxtaposition of the newspaper article, the photograph, and the headline could be interpreted as meaning that the FBI affidavit accused plaintiff of accepting bribes, she agrees with Judge Fullam that a reasonable fact finder could only conclude that the article is a fair, accurate, and complete reflection of the affidavit. The article and the affidavit had an equal sting, since both amounted to assertions that Lavin was corrupt.

the lead paragraph of the article. All in all, we are not persuaded that a reasonable fact-finder could conclude that the headlines, photograph, and article, separately and together, are more pejorative than the FBI affidavit.

One further issue requires brief discussion. There is, at least arguably, some uncertainty as to whether, under New Jersey law, the fair report privilege is defeated by proof of "malice in fact." As noted in *Schiavone, supra,* New Jersey courts uniformly followed § 611 of the original Restatement of Torts, which provided that the fair report privilege would be defeated upon proof that the report was "made solely for the purpose of causing harm to the person defamed". The present Restatement asserts that the motive of the publisher is immaterial. A New Jersey statute which at least partially codifies the common law privilege includes the words "unless malice in fact be shown by the plaintiff". N.J.Stat.Ann. § 2A:43–1 (West Supp.1984–85).

■ In *Schiavone,* the panel opinion predicted that the New Jersey courts would continue to apply the rule that the privilege is defeated by proof of actual intent to harm ("malice in fact"). Nothing has occurred in the interim to cast doubt upon that prediction. Accordingly, we conclude that "malice in fact" can defeat the fair report privilege.

Under the original Restatement view, plaintiff would need to prove that the *sole* reason for the defendant's republication of the official document was to cause harm to the plaintiff. At the very least, it seems to us, it would be necessary under the present law of New Jersey to establish that the statements in the official document were false and defamatory; that the defendant knew, or believed, that they were false; and that, in republishing the defamatory material, the defendant was motivated, at

least in substantial part, by a desire to cause harm to the plaintiff.

■ Plaintiff's Complaint in this case does not adequately charge that kind of malice. The only allegation bearing on that issue is contained in ¶ 13 of plaintiff's Complaint, which reads as follows:

"13. The article, headline and picture were written, laid out and published by the defendants with knowledge that the impression conveyed, both by express words, photograph and by innuendo, was not truthful or, at the very least, the defendants recklessly disregarded the truth."

This allegation suffices to prevent dismissal under the standards established in *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). But the fact that the defendants were merely republishing assertions made in an official document—*i.e.,* the fact that the fair report privilege arises—provides an extra layer of protection to the media defendants. Plaintiff must allege and prove actual knowledge of falsity, and actual intent to injure.

We review the record as it stood when the district court entered judgment. At that point, no contention that the defendants had forfeited the privilege by virtue of intent to harm was presented to the district court, nor has that issue been preserved for appellate review. Moreover, given the undisputed facts, and the assertions of plaintiff in the affidavits submitted to the district court, it seems highly unlikely that an allegation of malice in fact, as herein defined, could be made in good faith.[3]

### III. *CONCLUSION*

The judgment will be affirmed.

BECKER, Circuit Judge, dissenting:

Contrary to the majority, I believe that reasonable persons could disagree as to

---

3. In his affidavit, plaintiff asserts that, when the reporter interviewed plaintiff and Sisk together, plaintiff was not actually asked whether he had taken a bribe (and therefore did not make any statement one way or the other on that subject); and that the photograph was obtained by trickery (*i.e.,* without warning, as the reporter was concluding the interview). There is no suggestion of personal *animus.*

whether the headline, photograph and article published in the *Daily News* presented a fair and accurate report of the FBI affidavit as it relates to Lavin. I also believe that reasonable persons could disagree as to whether the "sting" of the total news account was materially greater than that of the affidavit. I concede that the case is a close one and could go either way on the facts. But, in my view, the case should not have been disposed of summarily; rather it should have gone to a factfinder. I would, therefore, reverse and remand for trial.

In order to explain my views, I must first set forth some facts of record that are either not mentioned or not adequately stressed by the majority.

### I. *The F.B.I. AFFIDAVIT*

After beginning with the general allegation that "DiGilio is able to conduct his various criminal activities with a significantly diminished risk of detection because he and some of his associates have developed a corrupt relationship with certain police officials," the FBI affidavit makes a series of direct allegations that Bayonne Public Safety Director James Sisk, Lavin's superior, had received bribe payments from DiGilio. For these reasons the headline "Best Cops Money Can Buy" is not inappropriate to Sisk.

With respect to Lavin, the affidavit makes essentially three allegations. First, the affidavit relates that a former Bayonne police officer, George Weingartner, allegedly told DiGilio of a conversation between Weingartner and Lavin, during which Lavin told Weingartner that he (Lavin) had seen Weingartner enter a particular location but had not marked it down (i.e., officially recorded the observation). The FBI agent affiant then editorializes that "from the context, it appeared that Lavin's observations would have had relevance to the theft of FBI documents case described earlier [in the affidavit]." The affidavit makes no other reference to Lavin's possible connection, if any, to the theft of documents case.

The second reference to Lavin is set against the background of DiGilio's com-

plaint that a Bayonne police officer had been taking surveillance photos of members of the DiGilio group. The affidavit relates the substance of an FBI-monitored conversation between DiGilio and Joseph LoRe, a DiGilio associate:

> LoRe said that "Jimmy" (Sisk) was not able to give orders that such photographs were not to be taken of DiGilio's people, but that Dugan had given LoRe assurances that the officer in question would be brought under control—first, because he was paying for the film himself on a salary of only $13,000; *second, because Lavin and everyone in the Police Department were giving the officer "the cold shoulder"*; and third, because "Jimmy" had separated the officer from his trusted partner and had reassigned him to the East Side where his movements could be controlled by supervisors who were in collusion with Sisk. Although LoRe had first discussed the possibility of using violence against the officer, he finally commented that the assurances (which "Jimmy" had sent to DiGilio, that the officer was being handled) would suffice (emphasis added).

No explanation or clarification of the "cold shoulder" reference appears in the affidavit.

The final reference to Lavin occurs in a portion of the affidavit describing telephone conversations between Lavin and another DiGilio associate named Anthony Gallagher, who lived in Bayonne. Gallagher had complained to Lavin, then head of the Internal Affairs Department of the police force: (1) about an officer taking pictures of him in the park, (2) about his car being ticketed by the same officer at 2:00 AM that morning, and (3) about a certain robbery of his (Gallagher's) trucking company. According to the affidavit, Lavin told Gallagher that he would check on these matters. The affidavit also states that the FBI monitored one visit by Lavin to Gallagher's home, but does not contain the details of any conversation that might have taken place during the visit, except a statement to the effect that the conversation did not

appear to be related to the robbery of Gallagher's company.

## II. . *THE DAILY NEWS ARTICLE, HEADLINE, AND PHOTOGRAPH*

Insofar as the text of the *Daily News* article purports to relate facts, it is largely devoted to the Digilio-Sisk relationship, and fairly tracks the FBI affidavit. The article details the allegations that Sisk had accepted bribes and sets forth certain supporting data. It repeats the conclusion in the FBI affidavit about DiGilio's "corrupt relationship" with certain Bayonne police officials. But the only specific factual reference in the article to Lavin is the "cold shoulder" reference. The article also states that La-

vin denied the acceptance of bribes, the doing of favors for DiGilio, or the existence of a relationship between himself and DiGilio. In addition, the article reports Lavin's statement that "[we] brought DiGilio to the FBI's attention" and "were the first to investigate [him]." [1]

Lavin's complaint stems principally from the headline,[2] photograph, and lead paragraph of the article that appear on page five of the March 7, 1983, edition of the *Daily News*. The sting of the headline, photograph and opening portion of the article, and their juxtaposition, can only be judged by reproducing them:

1. Additional background information concerning the Daily News investigation that led to the article and photograph is set forth in an affidavit filed by Lavin. The affidavit relates that on February 23, 1983, defendant D.J. Saunders, a writer for the *Daily News* and co-author of the article, appeared with a Daily News photographer at the offices of Public Safety Director Sisk in the Municipal Building in Bayonne, New Jersey. Saunders announced that he had copies of a "secret FBI affidavit" that contained statements concerning Sisk, Bayonne Detective Peter Dugan, and Lavin. Sisk called Lavin to his office, whereupon Saunders showed Lavin and Sisk certain portions of the pages containing references to Lavin.

Lavin's affidavit further relates that, during the course of the meeting, he produced for Saunders' review internal police documents showing that Lavin's conversations and meetings with Anthony Gallagher had taken place at the request of the Lavin's superiors and had been documented; that Gallagher had made written complaints to the Bayonne Police about alleged harassment; and that Lavin was in charge of investigating Gallagher's complaints of police harassment. According to the affidavit, Lavin also told Saunders that Weingartner was a known braggart and anything that he says is suspect. The affidavit states that Lavin denied having knowledge of LoRe's alleged statement, and that he did not know what was meant by the "giving the 'cold shoulder'" reference. According to Lavin's affidavit, the meeting lasted for approximately 40–60 minutes and at no time did Saunders ask, or Lavin discuss, whether Lavin had ever accepted bribes.

As Saunders and the photographer were leaving, the latter snapped a photograph of Lavin and Sisk as they were standing to say goodbye. This is the photo that later appeared in the *Daily News*.

2. The headline
 "THE MOB:
 "BEST COPS MONEY CAN BUY
 "Second of a series, page 5"
 appeared on page one of the March 7, 1983, edition.

1424

EXHIBIT A TO COMPLAINT

# Best cops money can buy

By D.J. SAUNDERS
and PAUL MESKIL
*Second of a series*

FBI agents who investigated New York mob operations in New Jersey concluded that the city of Bayonne has the best police force money can buy.

The six-year probe focused on criminal activities of the DiGilio Group, a Bayonne based mini-mob headed by John (Mace) DiGilio, 50, rackets ruler of North Jersey and soldier in the Genovese crime family, which is second only to the Gambino mob in size, wealth and power.

Results of the investigation were described in a 165-page affidavit filed in federal court to support a request for search warrants authorizing FBI agents to seize evidence from mob members, their homes and offices.

In the affidavit, FBI agents reported: "The evidence developed during the electronic surveillance (of DiGilio and his crew) established that DiGilio is able to conduct his various criminal activities with a significantly diminished risk of detection because he and some of his associates have developed a corrupt relationship with certain police officials."

The Daily News obtained a copy of the affidavit. Much of the information in it was obtained from electronic surveillance of gang members and from several inside "sources," or informers, who were members of the DiGilio Group.

THE FBI papers said two of these sources "separately reported that Bayonne Public Safety Director James

Sisk received bribe payments from DiGilio."

The affidavit also mentioned Deputy Police Chief Thomas Lavin, commander of the Bayonne Police Department's Detective Bureau, and Detective Peter Dugan.

According to the affidavit: "The first electronic surveillance evidence in corroboration of the informants'

## THE MOB
## And the waterfront

information was developed on 10-19-81 during a conversation" between DiGilio and two of his men. The affidavit said the mobsters "agreed that Sisk was obliged to tell them about any police activity in the area."

THE AFFIDAVIT also said a source inside the DiGilio Group had identified Bayonne lawyer Patrick Conaghan as "DiGilio's bagman," who handled "payoffs" between the DiGilio Group and public officials in Bayonne.

That informant, described in the affidavit as Source Nine, is a member of the DiGilio Group who had "provided information to a special agent of the FBI" for more than five years. The affidavit said his information had resulted in two arrests and the recovery of more than $50,000 in stolen property.

In interviews with The News, the three Bayonne police officers and Conaghan denied the allegations and in-

See MOB Page 20

DAN FARRELL DAILY NEWS

... ny Police Chief Thomas Lavin (l.) and Public Safety Director James Sisk.

The [editorial] statement, that "FBI agents who investigated New York mob operations in New Jersey concluded that the city of Bayonne has the best police force money can buy," is nowhere contained in the FBI affidavit.

## III. *DISCUSSION*

Lavin contends that, taken together, the article, headline, and photo depict him as one of the Bayonne police officers whom "money can buy," i.e., one who has taken bribes. He is undoubtedly so depicted, and

argues that the defamatory "sting" occasioned by the March 7 issue of the *Daily News* is significantly greater than that associated with the affidavit, which makes no reference to Lavin as a recipient of improper payments. Thus, according to Lavin the Daily News account falls outside the protections of the fair report privilege.

I have no quarrel with the summary of the applicable principles of the fair report privilege set forth in the appellees' brief and the majority opinion. In particular, I agree with the majority that the district court erred in applying to the disposition of the Daily News' summary judgment motion a lenient standard, tailored to the fact that

**3.** The majority thus recognizes the significance of the headline by considering the article, photograph and headline together. This is an accurate rendering of fair report privilege law and a salutary holding. It is common knowledge that headlines are generally written not by the reporters who have lived with the facts, but by rewrite men and city editors who, with the story in hand, are often interested in packaging it sensationally and marketing it quickly, a practice not likely to foster journalistic care.

**4.** The concern expressed by the district court over the potential "chilling effect" on the exercise of First Amendment rights by newspapers under a narrow interpretation of the fair report privilege, *see* Appendix at 30–31, led the court to commit legal error on this second point as well. As its bench opinion makes clear, the district court essentially ruled out the possibility that the configuration, or layout, of the article, headline and photograph of Sisk and Lavin could bear on its determination whether the Daily News abused and therefore lost the conditional fair report privilege. The court appears to have held for the News after concluding that "there is nothing defamatory in the picture ... the headline ... [or] the article *as separate elements.*" Appendix at 29 (emphasis added). Declining to review the editorial judgment that went into deciding upon the configuration of the "elements," the court opined:

> My goodness, if we get down to the point where courts and judges are going to judge defamation based on the juxtaposition of a headline which is not defamatory, a picture which is not defamatory and an article which is not defamatory—if we are going to decide it is defamatory because we don't like the way they're positioned next to each other, I think we'll be, instead of in the judicial business, we'll be in the newspaper publishing business, which I think the First Amendment doesn't really want us to be in.

this case involves a newspaper defending a claim of defamation. *See* majority opinion, at 1418–19; Appendix at 30–31. Perhaps more important, the majority correctly states that the pertinent question is whether "a reasonable fact-finder could conclude that the headline, photograph, and article, separately *and together*,[3] are more pejorative than the FBI affidavit" as each relates to Lavin. Majority opinion, at 1421 (emphasis added).[4]

I find especially helpful to the resolution of this case the standard formulated by the Seventh Circuit in a case cited by the majority:

Appendix at 20. At a later point during the oral argument, the district court reiterated the point, adding:

> Where you find the article is not defamatory, the headline is not defamatory and the picture is not defamatory, what you are left with is: Is one next to the other defamatory? Then you are very close to that area of intent which I say the curtain is down on.

Appendix at 33.

Had the district court applied the proper legal test and considered the impact of the article, headline and photograph together, *see* majority opinion, at 1421, its initial ruling on the motion for summary judgment might well have been different. The court acknowledged that the allegations against Lavin were not as serious as those against Sisk and others, and the court recognized that the positioning of the photograph and headline could have misled readers on that score:

> I will agree with you that the information in the affidavit does not go as far as Lavin is concerned as it goes against Sisk and perhaps others. *And it may well be that this configuration has an effect of giving somebody an idea there was more mention or more pejorative mention of Lavin in the FBI affidavit than there really was.*

Appendix at 29 (emphasis added). However, the district court declined to consider the potential incremental or synergistic impact of the positioning of the three "elements" of the *Daily News* story, and therefore failed in an important respect to consider the story as it appeared in print, instead confining itself to an analysis of three distinct and independent "elements."

In the wake of the panel's disposition, the district court will not have an opportunity to reconsider the parties' submissions in light of the appropriate legal standard. Nevertheless, the court's expressed concerns over the possibly misleading effect of the "configuration" serve to illustrate the closeness of the factual issue in this case. *See infra*, at 1420–21.

Unless the report is published verbatim it is bound to convey a somewhat different impression from the original, no matter how carefully the publisher attempts to summarize or paraphrase or excerpt it fairly and accurately. *An unfair summary in the present context is one that amplifies the libelous effect that publication of the government report verbatim would have on a reader who read it carefully—that carries a 'greater sting'.*

*Brown and Williamson Tobacco Corp. v. Jacobson,* 713 F.2d 262, 271 (7th Cir.1983) (citation omitted) (emphasis added). *See also* Restatement (Second), Torts, § 611, comment f (1977) ("although it is unnecessary that a report [protected by the fair report privilege] be exhaustive and complete, it is necessary that nothing be omitted or misplaced in such a manner as to convey an erroneous impression to those who hear or read it").

Reading the facts of record in a light favorable to the *Daily News,* I do not gainsay that a reasonable person, comparing the affidavit and the article as a whole (i.e., the overall effect of the various "elements"), could conclude that the article was a fair and accurate rendering of the affidavit. This conclusion would follow from the view that the affidavit implicated Lavin in a web of corruption so serious that the *Daily News'* gloss, i.e., its characterization of Lavin as a police officer who accepts bribes, added nothing to the "sting" of the FBI affidavit itself.

I also believe, however, that an equally reasonable person might react very differently to the two sources and, upon considering the article, conclude that it carries with it a materially greater "sting." More specifically, I believe that it would be equally reasonable for a reader to conclude on these facts that the allegations in the FBI affidavit concerning Lavin did not so nearly approximate in seriousness the charges or evidence against Sisk as to justify painting the two with the same brush or describing them with a common headline over their joint photograph. Unlike Sisk,

Lavin was in no way portrayed in the FBI affidavit as having taken a bribe or improper payment of any kind from anyone. Moreover, the references to Lavin in the FBI affidavit are not necessarily damning.

For example, the import of the statement by DiGilio associate Joseph LoRe, that Lavin and others were giving the "cold shoulder" to an unidentified officer who had been photographing "DiGilio's people," was vague and equivocal, and no further reference to it appears in the affidavit. Lavin's alleged failure to record his observation of Weingartner on a particular occasion suggests a dereliction of duty, at the least, but does not amount to an indisputable conclusion that Lavin was corrupt. Finally, the description of Lavin's contacts with Gallagher is arguably cryptic and susceptible of the more benign interpretation that Lavin, as he later stated, was charged with investigating alleged instances of harassment against Gallagher. *See supra* note 1.

I fully recognize the gravity of the charges against Lavin even when viewed in their less serious light; they are allegations of significant dereliction of Lavin's duty as a police officer. But I do not agree with the majority's position that there can be no reasonable debate over the proposition that the FBI affidavit "amounts to an assertion that plaintiff was directly involved in a corrupt relationship with members of organized crime in the Bayonne, New Jersey, area." Majority opinion, typescript at 10. Nor am I prepared to say that *as a matter of law* the affidavit depicts Lavin as one who is at least as culpable as a cop that money could (and impliedly did) buy. It is beside the point of this appeal that a reasonable jury could have, and perhaps would have, found this to be the case, for I simply cannot rule out the possibility that a jury, after carefully reading the complete FBI affidavit and then considering the complete *Daily News* account, could conclude that the latter "amplifies the libelous effect" of the former. *Brown and Williamson Tobacco Corp. v.*

*Jacobson,* 713 F.2d at 271. *See* Restatement (Second), Torts, § 611, comment f (1977) ("The reporter is not privileged ... to make additions of his own that would convey a defamatory impression...."). *Cf. supra* note 4 (noting district court concern that the article might have exaggerated Lavin's prominence in the affidavit).

The stinging potency of the photo of Lavin and Sisk, positioned as it was under the inaccurate, though very catchy, headline, should not be underestimated. The *Daily News* must realize that not all of its readers have the time or inclination to read every article thoroughly. It is beyond any question that the practice of scanning of headlines, without reading the story, is the practice of many readers. The Restatement recognizes this fact when it removes the cloak of the privilege, for example, from a defamatory headline that is qualified only in the text of the article. *See* Restatement (Second), Torts, § 611, comment f (1977). Similarly, I believe that a jury could reasonably decide that the headline and photograph painted Sisk and Lavin with the same brush—as two men who were on the take—when the affidavit made no mention of Lavin in connection with bribes. Having decided this, the jury in my view also could have concluded that the total news account unfairly placed Lavin in a harsher light than did the FBI affidavit and, therefore, was not a fair and accurate reflection of the affidavit. Hence, summary judgment should not have been granted.

I respectfully dissent.