510 So.2d 972 (1987)
Eduardo ORTEGA, Appellant,
v.
POST-NEWSWEEK STATIONS, FLORIDA, INC., a Florida Corporation, D/B/a WPLG-TV, Channel 10, Appellee.
No. 86-1464.
District Court of Appeal of Florida, Third District.
July 7, 1987.
Rehearing Denied September 4, 1987.
R. Stuart Huff, Coral Gables, for appellant.
*973 Steel Hector & Davis and Donald M. Middlebrooks, Miami, for appellee.
Before NESBITT, BASKIN and JORGENSON, JJ.
JORGENSON, Judge.
Eduardo Ortega appeals from a final summary judgment entered in favor of Post-Newsweek Stations, d/b/a WPLG-TV [WPLG]. We affirm upon a holding that fair and accurate reports of statements made during official proceedings are conditionally privileged.
Ortega sued WPLG following two broadcasts which he claimed were defamatory. Clarence Jones, a reporter at WPLG, was initially tipped off to the story by a staff member of the House Subcommittee on Commerce, Consumer, and Monetary Affairs. The staffer told Jones that there would be testimony at the subcommittee's hearing regarding money laundering in the South Florida area. Jones became interested in the story when he was told that one of the corporations being investigated by the subcommittee, Clemwood, N.V., owned the old Nixon compound on Key Biscayne. The staffer also told Jones that Robert Edwards, Deputy Commissioner of the Florida Department of Law Enforcement [FDLE], would be testifying before the subcommittee. Jones called Edwards to ask him about his testimony; Edwards was not there, so Jones spoke to FDLE agent Cummings. Jones also gathered information from public records, from FDLE agent Nill and a real estate analyst named Charles Kimball.
In addressing the Congressional subcommittee, Edwards introduced his remarks by stating:
Mr. Chairman, your staff has requested that I provide specific testimony concerning difficulties that the Florida Department of Law Enforcement has experienced in identifying principals involved in financial transactions resulting from Florida criminal activities when these transactions are conducted through the Netherlands Antilles. (Emphasis added.)[1]
The portion of Edwards' testimony specifically regarding Botero and Ortega was as follows:
This subject [Botero] is an indicted money launderer and cocaine smuggler in the Southern District of Florida. A copy of that indictment has been provided to the committee, Mr. Chairman.
This subject has been accused of laundering $55,000,000 in a twelve-month period (1979-1980) through a bank in Miami. Currency Transaction Reports (IRS Form 4789) were knowingly and intentionally not filed with IRS. This Miami bank also wired millions of dollars to unknown foreign banks and corporations and U.S. banks.
The Florida Department of Law Enforcement examined the subject's real estate holdings in South Florida, placing emphasis on Dade County.
* * * * * *
In the interest of clarity, I am directing your attention to Chart # 2 ... to help illustrate the numerous Netherlands Antilles' corporations that the subject is associated with. As you can see, A Florida general partnership is 30% owned by Haywards Heath Investments, N.V., and 70% owned by the subject and his fronts. The general partnership (alone) owns over $500,000 of real estate in Dade County.
* * * * * *
One final illustration on chart # 1 is the Clemwood, N.V., purchase of a residential compound on Key Biscayne, Florida. The house was purchased for $380,000, then torn down and another extremely large residence was built for an additional $1.2 million. These transactions were conducted by subject's partners and nominees. (Emphasis added.)
Edwards concluded by saying:

*974 In summary, Mr. Chairman, I would like to point out that the Netherlands Antilles' corporations, in concert with their banks, provide almost total anonymity for these criminals who wish to "launder" monies from the United States and who do not wish to pay taxes in the United States. (Emphasis added.)
Jones' report for WPLG can be summarized as follows:
Using a front to hide the true investor is an old tradition in this country. One of the best places now to hide real ownership is the Netherlands Antilles. Nixon's home on Key Biscayne has been bought with cash and bulldozed, and a new $1.2 home, also paid for with cash, has been erected in its place by Clemwood, N.V., a Netherlands Antilles corporation. Ortega was given power of attorney for Clemwood, N.V. "The Congressional Committee's investigation indicates Ortega is a front for Hernan Botero now waiting trial on charges of laundering 55 million dollars in drug profits. One of his investments may have been the old Nixon property."
This report was a fair and accurate abridgement of Edwards' testimony before the subcommittee and of information contained in public records and the FDLE's files. Although Botero's and Ortega's names were not mentioned in Edwards' public testimony, the subcommittee was provided with Botero's name by separate documentation.[2] Also, FDLE agents had told Jones that Botero was the subject involved and that Ortega held power of attorney for Clemwood, N.V., and lived on the property mentioned in the testimony.
In compliance with the mandatory notice requirement of section 770.01, Florida Statutes (1981), Ortega's attorney wrote WPLG, denying the allegations and stating that Ortega would be filing a defamation suit against WPLG.[3] WPLG directed Jones to investigate the matter further. Jones' additional investigation resulted in the broadcast of a second story which, summarized, went as follows:
The subcommittee explored how Netherlands Antilles corporations are used to evade taxes, hide narcotics profits, and hide the real investors in South Florida real estate. Bob Edwards, Deputy Director of the FDLE testified about the activities of two brothers, Hernan and Robert Botero, who are accused of laundering $55 million in drug profits. Edwards put charts into evidence showing the Boteros' real estate holdings. Included in the chart are eight Netherlands Antilles corporations. One of those, Clemwood, N.V., holds title to the Nixon property. Ortega lives in the new house on the Nixon property and says it is his house. Of the eight Netherlands Antilles corporations on the chart, three had given Ortega the power of attorney to sign real estate transactions for them.
The second story corrected the first story by saying that, although the FDLE had told Jones that the property was paid for in cash, in fact the property was encumbered by large mortgages. Jones also said that Ortega's attorney denied that Botero ever had an interest in Clemwood, N.V., that Ortega was a front for anyone, or that Ortega had anything to do with drug smuggling or money laundering. Finally, Jones stated that Ortega (or his attorney) was given the chance to discuss the matter on camera, but Ortega declined. The second story was also a fair and accurate report of the proceedings before the subcommittee.
*975 At the conclusion of discovery, WPLG moved for summary judgment. Relying on Nodar v. Galbreath, 462 So.2d 803 (Fla. 1984), the trial court granted WPLG's motion, ruling that news reports of statements made during an official proceeding are privileged. We agree. The fair and accurate reporting privilege continues to be WPLG's primary argument and is the focus of this appeal.
At the outset, it should be noted that in Florida the press has no qualified privilege to defame a private individual simply by virtue of the matter being of public concern. This "neutral reporting privilege" was WPLG's second argument on appeal. As the Florida supreme court stated in Miami Herald Publishing Co. v. Ane, 458 So.2d 239, 241 (Fla. 1984), approving 423 So.2d 376 (Fla. 3d DCA 1982): "This Court has not previously held that there is a qualified privilege for a newspaper or a private person to defame a private person merely because the defamatory communication is directed to a matter of public or general concern, and we decline to do so now." The rationale for Florida's declining to adopt this privilege has been explained by this court in its earlier Ane decision: There is "precious little which appears in the daily newspaper" or, equally, in a news broadcast which "is not a matter of public or general concern." Ane, 423 So.2d at 387 n. 5.[4]
Although the press has no qualified privilege to report on private individuals involved in matters of public concern, it does have a qualified privilege to report on matters brought out in public proceedings. Jamason v. Palm Beach Newspapers, Inc., 450 So.2d 1130 (Fla. 4th DCA 1984), rev. denied, 461 So.2d 115 (Fla. 1985) (newspaper has a qualified privilege for accurate reporting of defamatory deposition testimony of witness in judicial proceeding); see Nodar, 462 So.2d at 810 (statements of a citizen to a legislative body [a school board] regarding matters of public concern are conditionally privileged). Sometimes, of course, the official proceedings involve a discussion of private persons. Nodar.
The United States Supreme Court held in Gertz v. Robert Welch, Inc., 418 U.S. 323, 347, 94 S.Ct. 2997, 3010, 41 L.Ed.2d 789, 809 (1974), "that, so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." Florida has chosen to require only a showing of negligence; thus, if the press is negligent in its reporting, then it is liable for that negligence. Ane.
Because the standard of negligence set out in Ane still remains, the qualified privilege of reporting on official proceedings is limited in Florida. Thus, while the press may report upon a defamatory statement made at an official proceeding, it will nevertheless be liable if the private plaintiff shows that the press failed to take reasonable measures to insure that the report of the proceeding is accurate. Restatement (Second) of Torts § 611 (1976); see Walsh v. Miami Herald Publishing Co., 80 So.2d 669, 671 (Fla. 1955) (en banc); Huszar v. Gross, 468 So.2d 512, 516 (Fla. 1st DCA 1985).
In support of his argument that summary judgment was improper, Ortega maintains that he has no connection with Hernan Botero. Whether Ortega is in fact involved with Botero is irrelevant. The fact is that Edwards testified before a Congressional subcommittee that Botero was linked to Clemwood, N.V., and it is undisputed that Clemwood bought the Key Biscayne property, that Ortega has power of attorney for Clemwood, N.V., and that Ortega says the property is his home.
In arguing that the report was not fair and accurate, Ortega states that WPLG knew that there were many legitimate reasons for creating Netherlands Antilles corporations. *976 He therefore objected to WPLG calling Ortega (through Clemwood, N.V.) a "front" for Botero. "Front," however, is the term used by Edwards in his testimony before the subcommittee in referring to Botero's associates. Ortega therefore cannot prevail on that ground.
As an alternative argument, Ortega suggests that either the reporter must be present at the time of the official proceeding or he must review the transcript of the proceeding. Ortega relies on the fact that, before airing the first report, Jones did not actually attend the hearing or read Edward's testimony to the subcommittee. This does not change the fact that Jones' report was a fair and accurate summary because Jones' report consisted of information either testified to at the subcommittee hearing, Binder v. Triangle Publications, Inc., 442 Pa. 319, 327, 275 A.2d 53, 58 (1971) (the fact that a reporter gathers information of an official proceeding second-hand "is immaterial provided his story is a fair and substantially accurate portrayal of the events in question"), or told to him by FDLE personnel from information in the FDLE files upon which he was entitled to rely, Medico v. Time, Inc., 643 F.2d 134 (3d Cir.), cert. denied, 454 U.S. 836, 102 S.Ct. 139, 70 L.Ed.2d 116 (1981). In Medico, the Third Circuit held that fair and accurate reports of FBI materials not released to the public were privileged. The court determined that even though the materials were not public records, the report based on those materials constituted a report of official proceedings. The court concluded that the trial court's granting of summary judgment was proper.
In Lavin v. New York News, Inc., 757 F.2d 1416 (3d Cir.1985), a newspaper reported upon an affidavit filed in federal court by the FBI. The FBI affidavit discussed allegedly improper relationships between certain policemen and persons associated with organized crime. The article was headlined "Best Cops Money Can Buy." The circuit court of appeal, in determining whether the fair and accurate reporting privilege had been abused, recognized that there were certain discrepancies between what appeared in the affidavit and what was reported. For instance, the court viewed the headline as a statement of the newspaper, not as a reference to the contents of the official document. Nonetheless, the court held that the report was fair and accurate because it conveyed to its readers a substantially correct account of the official document, Restatement (Second) of Torts § 611 (1976), and because the report carried no greater "sting" than the official report, Brown & Williamson Tobacco Corp. v. Jacobson, 713 F.2d 262, 271 (7th Cir.1983).
Ortega's ultimate fall-back position is that WPLG knew or should have known that the law enforcement information and the subcommittee testimony were untrue. Even if this were the case, he cannot prevail. The privilege to report on official proceedings exists so that the public may be kept informed of the workings of government. That purpose is served, notwithstanding any inaccuracy of the information, when the information brought out in official proceedings is reported. Therefore, as the court concluded in Lavin, whether governmental agents "misinterpreted the situation, had incorrect information, or even consciously misstated the facts in the affidavit, there can be no liability on the part of the [newspaper] for republishing the contents of an official document, so long as their account is reasonably accurate and fair." Lavin, 757 F.2d at 1420. The press has no duty to go behind statements made at official proceedings and determine their accuracy before releasing them.
We also agree with the Third Circuit's observation in Medico, 643 F.2d at 142, that because organized crime has become so large, sophisticated, and secretive, "only the largest and most sophisticated intelligence-gathering entities can monitor them effectively." Consequently, the press has difficulty in reporting on organized crime: "In light of the difficulty in obtaining independent corroboration of [information on crime provided by a governmental agency], the press may often have to rely on materials *977 the government acquires if it is to report on organized crime at all." Id.
In summary, we hold that a qualified privilege of reporting on official proceedings is the settled law of Florida. Because both reports of the official proceeding regarding the private individual, Ortega, were fair and substantially accurate, the trial court correctly ruled that WPLG was not liable as a matter of law. Summary judgment was therefore appropriate. Brake & Alignment Supply Corp. v. Post-Newsweek Stations of Fla., Inc., 472 So.2d 517 (Fla. 3d DCA 1985), rev. denied, 484 So.2d 7 (Fla. 1986). The order of the trial court is, accordingly, affirmed.
Affirmed.
NOTES
[1] Tax Evasion Through the Netherlands Antilles and Other Tax Haven Countries: Hearings Before the Subcomm. on Commerce, Consumer, and Monetary Affairs of the House Comm. on Government Operations, 98th Cong., 1st Sess. 99-119 (1983) (statement of Robert Edwards, Deputy Commissioner of the Florida Department of Law Enforcement).
[2] Names were not mentioned before the subcommittee in Botero's and Ortega's case because Edwards stated at the outset of his testimony that he would not mention subjects by name when they were under active investigation or pending trial. The subcommittee was provided with Botero's name via the federal case number reflecting his indictment. The subcommittee was also shown a chart linking Botero to Clemwood, N.V. While the subcommittee was not provided with Ortega's name, it is undisputed that Ortega is attorney-in-fact for Clemwood, N.V., and lives on the property mentioned in the testimony, i.e., the property formerly comprising the Nixon White House.
[3] Section 770.01 requires that a plaintiff first notify the broadcaster and specify the alleged defamatory statements before an action for libel or slander can be brought against the broadcaster.
[4] In view of our holding, we do not address WPLG's third argument  that Ortega is a Vortex Public Figure. See e.g., Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Although we have considered all arguments made by Ortega, we address only those that merit discussion.